In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-3246, 07-3247, 07-3928 & 08-2269

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

OLUWADAMILOLA ARE, ANTWAN DANIELS,
JEROME MURRAY and JULIUS STATHAM,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 650—**Ronald A. Guzmán**, *Judge.*

ARGUED APRIL 1, 2009—DECIDED DECEMBER 30, 2009

Before POSNER, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This is a drug conspiracy case involving multiple defendants, twenty-seven counts, a variety of illegal drugs, guns, and the use of a telephone to facilitate a drug conspiracy. The drug activity centered around the "Four Corner Hustlers" gang on the south side of Chicago, an organization that has been mentioned in several opinions of this court over the last

decade. *See, e.g., United States v. Longstreet*, 567 F.3d 911 (7th Cir.), *cert. denied*, ___ S. Ct. ___, 78 U.S.L.W. 3294 (U.S. Nov. 16, 2009) (No. 09-7065); *United States v. Haynie*, 179 F.3d 1048 (7th Cir. 1999). Jerome Murray (the "Chief" of the gang) and Julius Statham pled guilty; Antwan Daniels and Oluwadamilola Are were tried by a jury. The defendants-appellants challenge several pretrial rulings and the admission of law enforcement expert evidence on the meaning of coded language. They also raise several sentencing issues. In addition, Are claims a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959). The number of issues raised results in a lengthy opinion, but ultimately we affirm. Our review of the record leads us to the conclusion that, by and large, the district court handled this case very well.

## I. Background

Jerome Murray was the chief of the "Four Corner Hustlers" gang on the south side of Chicago. He was convicted of murder in 1987. Following his release from prison in late 2001, he assumed the leadership role in the gang since other gang members looked up to him because of, among other things, his prior conviction. The Four Corner Hustlers were heavily involved in trafficking heroin, cocaine, and crack cocaine in the Chicago area. Murray bought wholesale quantities of the drugs to sell to customers, including other gang members, and his customers, in turn, distributed the drugs to their own customers. Oluwadamilola Are and Julius Statham supplied Murray with heroin and cocaine, respectively.

Antwan Daniels ("Sko") bought heroin directly from Are, through another person, with Murray's assistance. One such transaction occurred on January 26, 2005, when Are supplied Daniels with about 50 grams of heroin through a person identified as "Rocco" (a\k\a "Heavy" and "Lil' Morocco").

Prior to that, on January 25, Murray was recorded in a telephone call asking Daniels if he wanted "$50, man for that or a $100?" Murray immediately called Are, asking to "borrow fifty dollars," and explaining that he had "just hollered . . . at Sko [Daniels]." Are agreed and, half an hour later, he instructed Murray to call an individual named "Heavy" or "Lil' Morocco," and Murray did. In subsequent telephone calls, Murray arranged an in-person meeting between Daniels and Rocco. Law enforcement agents were conducting surveillance and observed Murray enter an apartment building and later meet with Daniels and another person at a convenience store.

The next day, January 26, Murray asked Are if he had "call[ed] back, uh, Sko?" Murray later spoke with Daniels, who talked Murray down to a price of $3,000 for the 50 grams of heroin. Murray then instructed Daniels to "hit Little Morocco . . . ." Rocco subsequently confirmed with Murray the quantity that Daniels was to get, asking if "this is twenty-five dollars," and Murray told Rocco to "give him, uh, fifty dollars." Later that evening while under surveillance, Rocco met with Daniels. Shortly after that meeting, law enforcement conducted a traffic stop of Daniels and seized 49.6 grams of heroin. Not wanting to jeopardize their investigation, the officers did not arrest Daniels but let him go.

After the seizure, Daniels called Rocco, who then called Murray. Murray asked Rocco if he had "holler[ed] at Olewah [Are]?" Rocco said, "no," and Murray reassured him that there "ain't nothin' to, uh, panic about." Murray made some calls and then he, Rocco, and an unidentified male met at a McDonald's. They were later joined by Are. Ronald Kimble, a Chicago Police Department ("CPD") task force officer, was posing as a homeless person and overheard some of the conversation between Murray, Rocco, Are, and the unidentified male. Kimble heard Murray say "they got the shit," "that that was the cost of doing business," and "better him than me." Kimble thought it appeared that Are lectured Rocco and the unidentified male. Kimble testified that Are was animated and instructed the others on how to evade the police by changing meeting locations and erratic driving. According to Kimble, Murray appeared disinterested, walking away, pacing up and down, and looking out the window. Kimble also said that Are's instructions were directed at the other two men.

Both Murray and Statham pled guilty pursuant to written plea agreements to Count One of the indictment, which charged them, Are, Daniels, and others with a criminal drug conspiracy in violation of 21 U.S.C. § 846. Are and Daniels were tried by a jury. At trial, the government introduced sixty-one recorded calls in its case-in-chief. The recorded conversations were between Jerome Murray and others including Are, Daniels, Murray Brown, Rocco, and Catherine Fauntleroy (Jerome Murray's wife).

Following several days of evidence, Are and Daniels were convicted as charged. Are was found guilty of three

counts: the drug conspiracy charged in Count One, distribution of heroin in violation of 21 U.S.C. § 841(a)(1), and knowingly and intentionally using a telephone to facilitate the commission of the drug conspiracy in violation of 21 U.S.C. § 843(b). Daniels was convicted of five counts: the drug conspiracy charged in Count One, possession with intent to distribute heroin in violation of § 841(a)(1), possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1), and two counts of knowingly and intentionally using a telephone to facilitate the commission of the drug conspiracy in violation of § 843(b). They filed post-trial motions for judgment of acquittal or new trial, all of which were unsuccessful. The district court sentenced all four defendants to prison: Are received 96 months, Daniels 180 months, Murray 262 months, and Statham 125 months. These appeals followed and are consolidated for disposition.

## II. Discussion

We first address the challenges to the district court's denial of two motions to suppress, followed by Are's claims under *Brady* and *Napue*, and then Are's and Daniel's challenge to the admissibility of expert testimony on the meaning of code words. After that we will turn to the various sentencing challenges. Additional factual background will be provided as necessary along the way.

### A. Daniels' Motion to Suppress

Daniels contends that the district court erred in denying his motion to suppress both his post-arrest

statement about the location of a gun and the gun itself. We review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Marrocco*, 578 F.3d 627, 632 (7th Cir. 2009).

*Background*

On July 19, 2005, FBI agents and two CPD officers went to Daniels' Country Club Hills home at 6:00 A.M. to execute a warrant for his arrest. They were aware that Daniels was being arrested for a drug conspiracy and that he had several prior arrests for drug and weapons offenses. FBI Agent Helen Dunn led the arrest team of the nine officers and agents. She knocked on Daniels' door and was greeted and allowed to enter by his wife, who directed them to the master bedroom. On the way there, the team conducted a brief protective sweep of the house, finding two young children in another bedroom. The children were brought, along with their mother, to the dining/living room area. Daniels was handcuffed in the bedroom and taken to the living room at about 6:05 A.M.

Before he was advised of his *Miranda* rights, an FBI agent asked him whether there were any weapons in the house, to which he replied that there was an AK-47 under the dresser in the bedroom. A CPD officer and FBI agents immediately went to the bedroom to look for the gun, but could not locate it under the dresser. An officer went back to the living room to report that the AK-47 could not be found. Upon hearing that, Daniels snickered and said that he must have gotten rid of it. Meanwhile, the officers

continued to search the bedroom, eventually finding the AK-47 assault rifle on the floor in a nearby closet. The search ended as soon as the gun was located. At approximately 6:10 A.M., Daniels was placed in an FBI car.

Daniels moved to suppress his post-arrest statement and the AK-47 firearm found in his residence. After holding an extended suppression hearing, the district court denied the suppression motion. The court concluded that the search was justified by exigent circumstances, specifically that Daniels' wife and children were present in the house and potentially could have retrieved the gun. The court also determined that the gun would have been inevitably discovered anyway, based on Daniels' statement. The court allowed the statement under the "public safety" exception to *Miranda*.

### 1. Post-Arrest Statement

Daniels argues that admission of his post-arrest statement about the location of the gun was in error because the public safety exception was inapplicable. Under the "public safety" exception to *Miranda* established in *New York v. Quarles*, 467 U.S. 649 (1984), police officers can ask a suspect questions without first giving *Miranda* warnings if they reasonably believe it is "necessary to secure their own safety or the safety of the public." *Id.* at 659. In *Quarles*, a woman told police she had just been raped and she described the suspect and where he was going (a supermarket). She also said that he had a gun. *Id.* at 651-52. The officers pursued the suspect, apprehended him in the supermarket, and discovered he was

wearing an empty shoulder holster. Before giving the suspect his *Miranda* warnings, the officers asked him where the gun was, and he told them it was in the super-market. This statement and the gun were excluded from evidence under *Miranda*. *Id.* at 652-53. The Supreme Court reversed on the basis of the "public safety" exception.

Here, the district court concluded that this exception applied based on the following: (1) the warrant established that Daniels had engaged in drug trafficking and had a criminal history for drug and weapons offenses; (2) the home had not been thoroughly searched, so any weapons present could have been hidden anywhere, even near the handcuffed Daniels; and (3) police could not rule out the possibility that another person was in the home. Daniels argues that the "public safety" exception should not apply here because he and the house were secured at 6 A.M. by nine armed officers who had per-formed a protective sweep and had no reasonable concern for their safety or for that of anyone else. From a broader perspective, Daniels argues that, if the public safety exception is applied here, it would render *Miranda* meaningless in the arrest-warrant execution context.

Daniels is right that his case is different in several respects from *Quarles*. First, the officers had no specific reason to believe that Daniels had a gun, only that he had prior weapons convictions and was involved in drug trafficking, which often involves weapons. Second, Daniels was found in his home with his family, rather

than in a public place like a supermarket. Third, a team of nine officers were present and had conducted a protective sweep. However, as the government points out, a sister circuit confronted a similar situation in *United States v. Williams*, 181 F.3d 945 (8th Cir. 1999). In that case, the police were executing a search warrant and arrested the defendant in the process. They asked the defendant if there was "anything we need to be aware of," and he told them about a gun he had. *Id.* at 953. Though Williams was handcuffed, the court found the statement admissible under the public safety exception, explaining:

> [T]he officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time. Similarly, the officers could not have known whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way.

*Id.* at 953-54 (footnote omitted). The court also relied on the fact that the officers had information that Williams had been arrested before on a weapons charge and was dealing drugs out of his apartment. The court considered a gun one of the "tools of the trade" for drug dealers. *Id.* at 954 n.14.

Daniels tries to distinguish *Williams* based on the fact that the officers knew Williams had been dealing drugs out of his apartment. This distinction is not significant, though. The *Williams* court relied more heavily on the general risks posed to officers in the arrest context than

on the specific facts of the case. And the fact that Williams was dealing out of his apartment seems less important than the fact that he was a drug dealer and guns are the tools of the drug trade.

We, too, have concluded that questioning a suspect about whether he has a gun may fall within *Quarles'* public safety exception. *See United States v. Edwards*, 885 F.2d 377 (7th Cir. 1989). In *Edwards*, the defendant was handcuffed and searched for weapons and contraband. None were found, but then he was asked if he had a gun. We decided that it was appropriate for the detective to ask the defendant if he had a weapon that might pose a threat to the detective or others in the area and upheld the admission of the defendant's statements. *Id.* at 384. We relied on the fact that drug dealers are known to arm themselves, especially when dealing drugs, in order to protect themselves, their drugs, and cash. *Id.*

The FBI agent's question to Daniels about the presence of a weapon in the house falls within the "public safety" exception to *Miranda*. The question seemed "reasonably prompted by a concern for the public safety." *Quarles*, 467 U.S. at 656. Though Daniels was cuffed and the officers and agents had conducted a brief protective sweep, they knew that Daniels was a drug dealer who was being arrested for drug conspiracy charges. They also knew that he had several prior drug and weapons offenses. But they did not know the location of any weapon that he may have had in the house. A weapon might have been hidden near the place where the officers placed Daniels before taking him outside and

thus would have been within his reach. Or it could have been in an easily accessible location for Daniels to lunge for on his way out the door. Therefore, it was reasonable for the officers and agents to believe that Daniels might have a gun on the premises and to ask him whether he had any weapons in the house.

Furthermore, the presence of Daniels' wife and children bolsters the conclusion that the question about a weapon falls within the public safety exception. The wife and children would be free to roam the house as the officers were leaving. Any one or all of them may have known the gun's location. It is conceivable that one of them could have retrieved the gun and attempted to use it against the officers and agents as they took Daniels away. And even when a quick protective search of a residence is conducted, the potential presence of an undiscovered but dangerous individual with access to a weapon cannot be discounted. The district court did not err in denying Daniels' motion to suppress his statement about the location of the weapon.

### 2. The Gun

Daniels also challenges the admission of the gun which the court concluded was justified on the grounds of exigent circumstances and inevitable discovery. Daniels asserts that several sister circuits apply the inevitable discovery doctrine only when "the prosecution [can] show that the lawful means which made discovery inevitable were being *actively pursued* prior to the occurrence of the illegal conduct." *United States v. Virden*, 488 F.3d 1317, 1322

(11th Cir. 2007) (quotation omitted, emphasis in original); *see also United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997). The rationale is that any other rule would "eviscerate the exclusionary rule, because in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action." *Virden*, 488 F.3d at 1322-23.

We explicitly rejected this approach in *United States v. Tejada*, 524 F.3d 809 (7th Cir. 2008). *Tejada* discussed *Virden* and *Conner* and held that their rule would confer a windfall on defendants because courts would have to suppress evidence merely because police were not seeking a warrant, even if a warrant would certainly have been issued. *Id.* at 812-13; *see also Marrocco*, 578 F.3d at 640 n.21. In this sense, *Tejada* took a "harmless error" approach to inevitable discovery. The doctrine applies if the government proves that "a warrant would certainly, and not merely probably, have been issued had it been applied for." *Tejada*, 524 F.3d at 813; *see also United States v. Sims*, 553 F.3d 580, 584 (7th Cir. 2009) (taking a nearly identical approach in the context of the particularity requirement for warrants).

The district court correctly held that the gun was admissible under the inevitable discovery doctrine. The officers had a statement from Daniels, who was being arrested on drug charges, that an AK-47 assault rifle was located in his home. Daniels' statement constituted probable cause to search the bedroom for the firearm. Given his statement, it is reasonable to conclude that the

officers would have sought a warrant to search the bedroom and, once they had, it is virtually certain that a warrant would have been issued. Daniels argues that the inevitable discovery doctrine cannot be based on an illegally obtained statement. However, as discussed above, Daniels' statement was not illegally obtained, so this argument fails. The officers inevitably would have discovered the gun by lawful means; therefore, the gun was admissible.

## B. Statham's Motion to Suppress

Statham contends that the district court erred in denying his motion to suppress evidence (two guns and approximately $21,000) found during a July 19, 2005, search of his home. Following a suppression hearing, the court found that Statham's fiancée gave her voluntary consent to the search of the house (the house was hers) and that Statham gave his voluntary consent to the search of the safe where the evidence was found and, therefore, denied the motion.

The government responds that Statham's plea agreement did not reserve the right to appeal the suppression ruling and, thus, he has waived any right to appeal this issue. Indeed, Statham's plea agreement expressly provides: "Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and only may appeal the validity of this plea of guilty."

Statham replies that we should reach the merits because they have been briefed, citing the dissent in *United*

*States v. Schmidt*, 47 F.3d 188, 192 (7th Cir. 1995) (Ripple, J., dissenting). However, in *Schmidt* the government did not assert the appeal waiver but instead fully addressed the merits. *Id.* Here, in contrast, from the outset, the government has asserted Statham's waiver of appellate rights; it argued the merits only in the alternative. "It is well established that an unconditional plea of guilty operates as a waiver of all formal defects in the proceedings, including any constitutional violations that occurred before the plea was entered." *Gomez v. Berge*, 434 F.3d 940, 942 (7th Cir. 2006). Statham's guilty plea expressly waived his right to appeal all issues other than the validity of his plea, which he does not challenge on appeal. Statham's waiver encompassed the denial of his suppression motion. So we decline to review that ruling. (The court's findings that voluntary consent was given to search the house and safe were not clearly erroneous, so reaching the merits would not have provided Statham any relief.)

### C.  Are's *Brady* and *Napue* Challenges

Are contends that the district court erred in denying his motion for a new trial because the government failed to correct a government witness's testimony in violation of *Napue v. Illinois,* 360 U.S. 264 (1959), and failed to disclose exculpatory information to him in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). The government responds that it neither presented false testimony nor withheld material exculpatory information. "The decision whether to grant the parties a new trial is one committed to the district court's discretion, and our review of that decision

is deferential." *United States v. Jackson*, 546 F.3d 801, 812 (7th Cir. 2008) (citation omitted), *cert. denied*, 129 S. Ct. 2010 (2009).

*Background*

At trial, Are argued that he was involved with Murray in connection with his music business and offered the testimony of his wife, Tenielle, as support. Are maintains that Tenielle's credibility was critical to his defense.

On July 19, 2005, law enforcement conducted a search of Are's home and arrested him. At trial, CPD Officer Colello (the team leader for the search of Are's house) testified that Are's wife (Tenielle) was not pulled over in her car after she left the Are home on the day of the search—at least not that he knew of. In her testimony on behalf of Are, however, Tenielle disputed that testimony and explained the details of the stop and search of her vehicle. In cross-examining Tenielle, the prosecutor implied that she was skeptical of Tenielle's testimony.

During a trial break following Tenielle's testimony, the government received some information that an officer knowledgeable about "traps" (compartments concealed in automobiles for the storage of drugs/cash) had been called and searched Tenielle's car. The government did not disclose that information at that time, but proceeded with final argument during which the prosecutor repeatedly asserted that the police officer witnesses were credible. The Assistant United States Attorney ("AUSA") also stated that "Officer Colello told you that he didn't know

anything about the search of the car. He had left. He was with Defendant Are. Maybe the car was searched. I don't know."

Six days after the defendants were convicted, government counsel interviewed CPD Sergeant Fred Waller, who indicated that he had called for a search of Tenielle's vehicle and that a "trap" expert had been called for that purpose. The day of Waller's interview, the AUSA sent defense counsel a letter, summarizing the discussion with the agent on the trial break and the interview of Waller. Are moved for a new trial, asserting *Napue* and *Brady* violations.

## 1. The Failure to Correct a Government Witness's Testimony

Are argues that the government failed to correct Officer Colello's testimony that Tenielle's car was not searched. He also argues that the AUSA perpetuated Colello's false testimony in closing argument by stating "I don't know" if Tenielle's car was searched. "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. "*Napue* stands for the proposition that prosecutors may not suborn perjury." *United States v. Holt*, 486 F.3d 997, 1003 (7th Cir. 2007). *Napue* extends to false testimony that goes to the credibility of a witness. *Napue*, 360 U.S. at 269.

The parties dispute the correct standard by which we determine whether testimony or withheld information was material for purposes of *Napue* and *Brady*. Both

materiality standards are well-defined. In the *Brady* context, "[e]vidence is material if there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Under *Napue*, "when the prosecutor knowingly relies on false testimony, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Braun v. Powell*, 227 F.3d 908, 920 (7th Cir. 2000) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). In *Mataya v. Kingston*, 371 F.3d 353 (7th Cir. 2004), we noted that "the standard is the same" where the *Napue* violation "was not distinct from the *Brady* violation in any realistic sense." *Id.* at 358-59. Are argues that the *Napue* standard applies, whereas the government submits that the *Brady* standard applies in cases like this where the alleged *Napue* violation grows out of the alleged *Brady* violation. We need not resolve this dispute because even under the standard more favorable to the defendant, Are has not shown either a *Napue* or *Brady* violation.

The prosecutor did not knowingly rely on false testimony from Officer Colello. Colello testified that he was not "aware" and did not "know of" officers searching Tenielle's car. Neither the mid-trial information received by the government nor the post-trial interview revealed that Colello was present for that search or was otherwise aware of it. The government had no reason to believe that Colello was not telling the truth. *Napue* does not require the government to recall Colello in its rebuttal case to

clear up any possible confusion when the witness's testimony was not perjurous. *See Holt*, 486 F.3d at 1003 ("*Napue* stands for the proposition that prosecutors may not suborn perjury, not that prosecutors must present evidence exculpatory to a defendant in their case-in-chief.").

Nor did the government knowingly rely on false statements in the AUSA's closing arguments. The prosecutor's statements were far from material even under the *Napue* standard. The government had conflicting stories. The remark, "Maybe the car was searched. I don't know," seems to reflect this uncertainty. Admittedly, the better course for the AUSA would have been to avoid commenting on Tenielle's testimony about the car search. But any impropriety in doing so did not, "in light of the record as a whole . . . deprive[ ] the defendant of a fair trial." *United States v. Morris*, 498 F.3d 634, 640 (7th Cir. 2007) (quotation omitted), *cert. denied*, 128 S. Ct. 2502 (2008).

Are argues that Tenielle's testimony about him being involved in the music business was central to his defense. He asserts that the jury would find Tenielle incredible based on the difference between her testimony and Colello's. According to Are, this "[u]nfair blemish on Tenielle's veracity likely contaminated all aspect of her testimony and the defense case in general." But the AUSA's remark during closing only slightly disparaged Tenielle's testimony. And more importantly, the car search was an entirely collateral matter and had nothing to do with Tenielle's testimony about Are's music business. Furthermore, the government's case against Are was

substantial. There is no reasonable likelihood that the prosecutor's comment, "I don't know," could have affected the jury's judgment.

### 2. The Failure to Disclose Exculpatory Information

Are also argues that the government's failure to disclose what it learned mid-trial about the car search violated *Brady*. "For a *Brady* violation to exist, entitling a defendant to a new trial, he must establish (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant; and (3) that it is material to an issue at trial." *Palivos*, 486 F.3d at 255. As the government responds, however, Are already knew that Tenielle's car was searched—she testified that it was—and therefore this evidence was not "suppressed." *See United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) ("[E]vidence for *Brady* purposes is deemed 'suppressed' if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."). At a minimum, the evidence of the car search was available to Are through the exercise of due diligence. Tenielle, his wife, certainly knew of the search, and the government didn't prevent her from telling Are about it. Yet, giving Are the benefit of the doubt, perhaps he didn't know about the other officers who were involved in the search and who could have testified that nothing was found. (We say "perhaps" because Tenielle would have known of the other officers'

involvement, and it seems that a simple investigation by Are would have uncovered this information.)

Nonetheless, there was no *Brady* violation because the evidence was not material. As stated, the car search was a collateral matter. The absence of drugs in Tenielle's car does not negate proof that Are was a drug dealer. Instead, it just proves that drugs were not found in her car, and that has no relevance to the case against Are. (The government's evidence did not implicate either Tenielle or her vehicle in the drug conspiracy.) Moreover, the evidence would be largely cumulative of Tenielle's testimony that her car was searched but nothing was found.

Are asserts that he could have called the searching officers as witnesses to rebut Colello's testimony and bolster Tenielle's. But Colello testified that he wasn't "aware" of whether a car search occurred or not. So unless another officer could testify that Colello *was* there, the other officer could not contradict Colello. And, as discussed above, any attack on Tenielle's credibility was slight and invited by the defense's questioning of Colello. We perceive no reasonable probability that additional evidence about the car search would have led to a different outcome for Are.

### D. Are's & Daniels' Objections to the Admission of Expert Testimony

Are and Daniels contend that the district court abused its discretion in admitting expert testimony by police officer Robert Coleman on the meaning of code words in

recorded conversations. The government had a wiretap on Murray's cell phone and captured over 20,000 calls. Sixty-one of them were played at trial. Officer Coleman opined that 50 grams of heroin was a distribution amount and that coded language (25/50/100 dollars) was used in the recorded conversations to refer to a transaction of a quantity (grams) of drugs.

Are and Daniels contend that the admission of this testimony violated Federal Rule of Evidence 704(b), which prohibits expert witnesses from opining (or stating an inference) that the defendant did (or did not) have the mental state constituting an element of the crime charged. The focus of this argument is on the telephone counts, which require proof that a defendant "knowingly and intentionally" used a telephone to facilitate a drug offense. But they also advance this argument with respect to the other counts of conviction.

The government claims that Are and Daniels only challenged Coleman's testimony on the basis of relevance and lack of personal knowledge and never objected before or during trial to the use of expert testimony to interpret "code words" on the ground that such testimony would invade the province of the jury. Thus, it argues, they have waived or at least forfeited the issue. The defendants assert that they did object to Officer Coleman's testimony on the ground that it invaded the province of the jury.

We generally review the district court's admission of expert testimony for an abuse of discretion. *United States v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009). But if the defen-

dants forfeited this argument, we would review for plain error. *United States v. Canady*, 578 F.3d 665, 669 (7th Cir. 2009). And if they waived the issue, we could not review it at all. *Id.*

Rule 704(b) states:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed. R. Evid. 704(b). The trial transcript shows that defense counsel objected based on "testifying as to the ultimate issue in this case" and that Officer Coleman would be "invading the province of the jury." We can conclude that the defendants did not waive the issue, but whether this objection was sufficient to avoid forfeiture is a more difficult call. Counsel did not specifically mention the words "mental state," but use of the words "ultimate issue" signifies a Rule 704(b) objection.

Still, it appears that the Rule 704(b) objection related to the conduct that would be sufficient to prove "trafficking" and not the phone charge. Defense counsel said: "It's a little different when you take a call that you introduced in this case and testify that that specific call related to a defendant. You're basically saying this defendant is guilty of trafficking, Judge. When you do that, that's the ultimate issue." At no time during the sidebar about

Coleman's expert testimony did defense counsel object on the basis that Coleman's testimony went to the ultimate issue on the phone charge. Under a strict sense of "forfeiture," the district court probably did not have an opportunity to consider whether Coleman's testimony invaded the jury's decisionmaking as to "knowingly" using a phone. The colloquy was mostly about Coleman testifying to the ultimate issue, irrespective of the charge, and the court seemed to overrule the objection on a general basis, not on the basis of the specific charge. In the end, however, we need not resolve whether the defendants forfeited this issue, because under either standard of review, we find no error here.

This circuit has routinely upheld the admission of expert testimony from law enforcement purporting to translate "code words" used by conspirators during intercepted phone calls. *E.g.*, *United States v. Goodwin*, 496 F.3d 636, 641-42 (7th Cir. 2007). And we have held, generally, that Rule 704(b) applies to the expert testimony of law enforcement officers. *E.g.*, *United States v. Morris*, 576 F.3d 661, 674 (7th Cir. 2009). However, we have not analyzed testimony about "code words" in terms of Rule 704(b). Other circuits have confronted this issue and have allowed law enforcement experts to translate code words in the narcotics context. *E.g.*, *United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003) ("[W]e conclude that the district court did not err by allowing [the officer] to testify that code words referred to specific drugs."); *United States v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) (same).

The appellants rely heavily on the Ninth Circuit's approach to Rule 704(b) issues in expert law enforcement

testimony. *See United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997) (holding that Rule 704(b) prohibits "testimony *from which it necessarily follows*, if the testimony is credited, that the defendant did or did not possess the requisite *mens rea*") (emphasis added). But we have taken a different approach.

In *United States v. Lipscomb*, 14 F.3d 1236 (7th Cir. 1994), we observed:

> Decisions applying Rule 704(b) to the expert testimony of law enforcement officials have found it significant whether the expert actually referred to the intent of the defendant or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent.

*Id.* at 1239; *see also Morris*, 576 F.3d at 674. Then, reviewing the text and legislative history of Rule 704, we concluded that Rule 704(b) only prohibits expert testimony that is based on an analysis of the defendant's mental processes, only a "slight" limitation on expert testimony. *Lipscomb*, 14 F.3d at 1241-42. Still, we recognized the dangers that "modus operandi" testimony carries. To reconcile our view of Rule 704 with those concerns, we concluded:

> [W]hen a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded

under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes.

*Id.* at 1242 (citation omitted). We affirmed the district court's decision to allow the expert testimony because the officers testified that their opinions were based on their knowledge of "common practices in the drug trade" and not on "some special familiarity with the workings of Lipscomb's mind." *Id.* at 1243; *see also Morris*, 576 F.3d at 675 (upholding admission of police sergeant's testimony about common practices of street-level narcotics sales where he testified only as an expert, never alluded to his impressions or recollections from the search, never referred to defendant specifically, and never expressed an opinion about defendant's actual state of mind).

The admission of Officer Coleman's testimony about "coded language" did not violate Rule 704(b). Coleman testified based on his experience and training in wiretap and drug trafficking investigations, which he outlined extensively for the jury. He testified that he was familiar with the language and words that "drug dealers" use. He also stated that he had not interviewed any witness in relation to the case on trial, had not reviewed any documents in connection with the case, other than some transcripts, and had no knowledge of the facts of the case or the allegations against the defendants. Ironically,

defense counsel objected to Officer Coleman testifying as an expert on the basis that he had no knowledge about the particular case other than the transcripts that he had reviewed. Thus, it is apparent that Coleman testified as an expert on the basis of his knowledge of drug dealers' use of coded language generally and not on some special knowledge of the defendants' mental processes or mental states. In effect, Officer Coleman testified about the coded language, or "druggish," much like another expert would translate a foreign language. Had the recorded conversations been conducted in Spanish instead of a drug code and had Officer Coleman testified as to the English translation of the Spanish words, we doubt the defendants would have objected, at least not on the basis of testifying as to an ultimate issue or invading the province of the jury. Moreover, Coleman never testified about what the defendants "intended" and he gave no opinion as to their mental states.

We acknowledge that this case is somewhat different from ordinary drug cases because of the telephone charges. Are and Daniels argue that, once the jury credited Officer Coleman's testimony, no inference was necessary to find that they possessed the requisite intent—one cannot utter drug code into a telephone without knowingly using the phone to conduct drug transactions. They cite *United States v. Badger*, 983 F.2d 1443, 1452 (7th Cir. 1993), which rejected a sufficiency of the evidence challenge on a "phone charge" conviction because the jury was free to conclude that the defendants were not "playing games" but were talking

about drug deals. In *Badger*, the defendants acknowledged that they were discussing drug deals on the telephone. But here, Are and Daniels do not concede that they were using coded language to discuss drug transactions over the telephone, which makes this case quite different. If the jury credited Officer Coleman's expert testimony about drug dealers' use of coded language (which it did), it does not necessarily follow that Are and Daniels knowingly used a telephone to facilitate drug deals. This is because the jury would still have to evaluate the coded terms in the context of the entire conversation to determine whether, as a whole, the conversation was intended to further a drug transaction. Clarifying the coded terms did not tell the jury that Are and Daniels possessed the requisite mental state. Perhaps they were just "playing games" instead of discussing real drug transactions. Significantly, Officer Coleman never opined as to Are's or Daniels' intent or knowledge.

As the government argued, Officer Coleman's testimony must be viewed in the context of the charges and jury instructions. The indictment charged the telephone counts in relevant part as follows:

> [Are or Daniels] . . . knowingly and intentionally used and caused to be used a communication facility, namely, a telephone, in committing and in causing and facilitating the commission of a felony in violation of Title 21, United States Code, Section 846, namely, conspiring to distribute and possess with intent to distribute controlled substances, *as charged in Count One of this Indictment*[.]

(emphasis added). The district court instructed the jury that to convict Are and Daniels of the telephone counts, the government had to prove beyond a reasonable doubt that:

> First, the particular defendant you are considering used a telephone; second, that the use of the telephone was accomplished as part of the committing of or to cause or facilitate the committing of conspiracy to possess with intent to distribute and to distribute a controlled substance, *as charged in Count 1 of the indictment*; and, third, that such use of a telephone was knowing or intentional.

(emphasis added). The court also instructed the jury that they should judge the opinions of witnesses about matters requiring special knowledge or skill "in the same way you judge the testimony of any other witness" and "[t]he fact that such a person has given an opinion does not mean that you are required to accept it." The jury was told that such testimony should be given as much weight as they thought it deserved. Thus, the jury was appropriately instructed on how to evaluate Officer Coleman's expert testimony about the coded language.

Moreover, proof that a defendant knowingly used a telephone to facilitate a drug deal was not sufficient to sustain a conviction under the telephone counts. Instead, the government had to prove that the defendant's use of the telephone was part of the commission of, or causing or facilitating the commission of, the specific conspiracy alleged in Count One. *See United States v. Briscoe*, 896 F.2d 1476, 1510 n.28 (7th Cir. 1990) (noting that where the

indictment alleged that the telephone calls facilitated the substantive offenses and the conspiracy to commit those offenses, it was sufficient to prove that the calls facilitated either the substantive offenses or the conspiracy). And the government also had to prove that in using the telephone, the defendant knowingly or intentionally committed, or caused or facilitated the commission of the conspiracy charged in Count One. *See United States v. Rodgers*, 755 F.2d 533, 542-43 (7th Cir. 1985). Officer Coleman did not testify that Are or Daniels did, or did not, knowingly or intentionally use the telephone to commit or cause or facilitate the commission of the drug conspiracy alleged in Count One. If the indictment had not charged the conspiracy as a separate count but alleged that the defendants used a telephone to facilitate a drug conspiracy, the government still would have had to prove that the defendants knowingly or intentionally used a phone to facilitate the conspiracy. It would not be enough merely to prove that they used a phone to facilitate a drug deal. Though Coleman's testimony is strong circumstantial evidence of the *mens rea* required for the telephone charges, even more so than for the drug charges, its admission did not violate Rule 704(b).

### E.  Sentencing Issues

Each appellant except Daniels raises sentencing challenges. We review the district court's legal interpretation of the Guidelines de novo, *United States v. Abbas*, 560 F.3d 660, 662 (7th Cir. 2009), and review its findings regarding a defendant's role in the offense and drug

quantity for clear error, *United States v. Fox*, 548 F.3d 523, 528 (7th Cir. 2008). The district court's factual findings at sentencing must be based on a preponderance of the evidence. *See United States v. Goodwin*, 496 F.3d 636, 643 (7th Cir. 2007). And "we will affirm the district court unless, after considering all of the evidence, we are left with a definite and firm conviction that a mistake has been committed." *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008) (quotation omitted).

### 1.  Are

We begin with Are, who challenges the district court's finding that he was responsible for more than 100 grams (but less than 400 grams) of heroin and that he was a manager or supervisor. These findings resulted in a base offense level of 26, *see* U.S.S.G. § 2D1.1(a)(3), (c)(7) (2006), and a three-level enhancement under U.S.S.G. § 3B1.1(b).

*Background*

Between December 13 and 23, 2004, Jerome "Head" Murray had phone conversations with Are and a Murray Brown (to avoid confusion in this section, Jerome Murray will be referred to by his nickname "Head" and Murray Brown will be referred to as "Brown"). These conversations were recorded and culminated in a meeting between Are and Head on the 23rd. On the 13th, Head was talking to Brown and referred to "my guy" "that's in Nigeria" (Are is Nigerian) and said that he (Head) had to

"come up with $10" and that "he [presumably Are] already came up with his money." Brown asked Head, "So he gonna have the whole security thing down pat then, huh?" Head responded, "Oh no he don't, you know . . . we got, uhm, start off, uhm, half of uhm, tryin' to, . . . you know got everything right, right, you know." Brown asked Head, "When is this gonna start?" Head answered, "as soon as I . . . come up with, uh, uhm . . ." at which point Brown interjected, "The 10." Head replied, "Yeah, yeah. So I only need but 3 more now."

In the next week, Head and Are engaged in several recorded conversations. Head advised Are that he (Head) was "waiting on his man" who "just sold his Vette" and would give Head a "30 piece," and then said that his man "was gonna give me 5" "and I got 5." Head later told Are that he "might just gonna have to go to the bank to get, uh, five more dollars out" and that he was "waitin' on this [person] to get me, . . . five, that owe me." Head said that "somebody was tryin' to hit me . . . at my bank" and he thought he "might have to change my bank thang." Head explained it was "the TCF shit . . . but they straightened it out. That's why I had to wait. . . . I don't need but four more dollars now." Head again told Are that "I got to get some, I got to get some money. See once I get down there, I'm straight." Head referred to "a little, uh, project we got goin'" and said that "I need like two more dollars and I'm cool . . . I'm talkin' about 200 to go to this thing." Head went to Atlanta between December 19 and 22.

On December 23, Head and Are arranged to meet. Law enforcement officers observed Head leave an apartment,

meet for less than a minute in Are's Mazda, and then return to the apartment. The officers followed Are, who engaged in counter-surveillance, including speeding, several U-turns, as well as pulling into a strip mall, waiting, and then driving away in the opposite direction. Are successfully eluded an effort by the police to stop him. About a month later, the Daniels-Are 49.6-gram transaction took place. In his plea agreement, Head admitted that on January 26, 2005, he supplied Daniels with 50 grams of heroin.

The Presentence Investigation Report ("PSR") and the district court concluded that the December 23rd meeting between Head and Are was related to a drug deal between them involving 125 grams of heroin. This was based on the December conversations, which were interpreted as referring to a $20,000 deal—the equivalent of 125 grams of heroin. At sentencing, Are argued that the conversations about money referred to his and Head's business relationship in connection with Are's recording studio. The district court rejected that assertion and concluded that the conversations referred to a drug deal. The court based this finding on the wiretap conversations in the case, the way Are interacted with Head and others, the use of coded language, the officers' subsequent observations of Are's and Head's meeting, including Are's concerted efforts to elude the police after the meeting had occurred, and the familiarity between Head and Are, which the court found indicated that they had been doing such deals for a long time. Responsibility for at least 100 grams but less than 400 grams of heroin

resulted in a base offense level of 26, *see* U.S.S.G. § 2D1.1(a)(3), (c)(7) (2006).

With respect to the leadership enhancement in § 3B1.1(b), the court relied on a January 2005 recorded conversation related to the January 26 deal in which Are directed Head to call Rocco. The court relied further on what appeared to be a lecture that Are gave Rocco and another individual at the McDonald's on the night of the heroin seizure about "how they screwed up and how they better do things in the future to keep from getting caught." Are was also overheard lecturing Rocco and the other individual on the use of evasive driving tactics to determine if they were being followed and frequently changing meeting locations. The district court inferred that a person who would lecture other participants in a drug conspiracy on how they were supposed to conduct their business could only be someone in a managerial position. The court reasoned that such a person supervised the others' activities—instructing them not only on what they should do, but how they should go about doing it. Therefore, the court determined that Are was a manager or supervisor of the criminal activity (no one disputed that the conspiracy involved five or more people), and applied the three-level enhancement under § 3B1.1(b).

### a. Drug Quantity

For purposes of sentencing, because Are was convicted of the criminal drug conspiracy charged in

Count One, he is responsible not just for his own acts but also for the acts of his coconspirators "that were both made in furtherance of the conspiracy and [reasonably] foreseeable to [him]." *United States v. Dean*, 574 F.3d 836, 844-45 (7th Cir. 2009) (citation omitted); *see also United States v. Goodwin*, 496 F.3d 636, 642 (7th Cir. 2007). An application note to § 2D1.1 provides:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, . . . [and] similar transactions in controlled substances by the defendant . . . .

U.S.S.G. § 2D1.1 cmt. n.12; *see United States v. Bautista*, 532 F.3d 667, 672 (7th Cir.), *cert. denied*, 129 S. Ct. 773 (2008).

The record supports the finding that Are was involved in drug deals in December 2004 and on January 26, 2005. We do not believe that the district court erred in finding that the December coded conversations were about a drug transaction. In addition to those recorded calls, the evidence established that Are was Jerome Murray's heroin supplier and there was a January 2005 heroin transaction involving Are and Murray. Also, Murray's quick meeting with Are on December 23, typical of a drug transaction, and Are's subsequent evasive driving both suggest that the conversations were about drug dealing, and involved a transaction on December 23.

Nor do we believe that the district court clearly erred in finding the quantity of heroin from the dollar amounts discussed or in finding the value to be $20,000. Because no drugs were actually seized from the December 2004 transaction, the district court properly extrapolated the drug quantity from the alleged price of $20,000. *See* U.S.S.G. § 2D1.1 cmt. n.12. The court could reasonably infer that when Murray talked about coming up with "half" of the purchase price, which he described as "10" or "$10," that he was referring to $10,000. And this reasonably suggested that the total purchase price was $20,000, which was the cost of 125 kilograms of heroin. Such an inference may at first seem inconsistent with Officer Coleman's testimony about the meaning of the coded language (dollar amounts meant grams of heroin). But a closer look reveals that it is not. Tellingly, although Are argued that the December 2004 telephone calls were about his recording business rather than drugs, he did not dispute that in those conversations the numbers referred to money.

In addition, the context of the telephone calls reasonably suggests that the numbers and dollar amounts were references to money (in terms of thousands of dollars). Jerome Murray talked about needing to "come up with the $10" to execute a transaction with the "guy in Nigeria." This transaction seems to have been in the works for some time—the initial conversation occurred ten days before Are's and Murray's December 23rd meeting—which was atypical for the conspiracy. In one call, Murray said he only needs "3 more now." The evidence established that Murray was the kingpin of the

drug operation, so it would be unlikely that he would be struggling to come up with three, or even ten, grams of heroin. In other calls, the January 25 call for example, he talked about obtaining 25, 50, and even 100 grams without expressing any uncertainty about his ability to quickly consummate such a deal. Added to that are Murray's statements that his friend was selling his Vette, that he (Murray) had to go to the bank, and that he was having trouble with the bank and his TCF account. These statements suggest that Murray was referring to money rather than a drug quantity. And as noted, the evidence established that Murray purchased heroin from Are and did so on other occasions. This also supports the inference that Murray was trying to come up with money for a $20,000 heroin transaction with Are.

The evidence wasn't overwhelming and the district court's explanation was not elaborate. But we are not left with a definite and firm conviction that the court made a mistake in first finding that the December 2004 drug transaction had a value of $20,000 and then finding that this dollar amount was for 125 grams of heroin. There was enough evidence allowing reasonable inferences to constitute a preponderance supporting that amount.

### b.  Section 3B1.1 Enhancement for Aggravating Role

Moving on to the enhancement for Are's role in the offense, U.S.S.G. § 3B1.1(b) provides: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by

3 levels." In determining whether a defendant was a manager or supervisor, the court should consider such factors as

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4; *see also United States v. Longstreet*, 567 F.3d 911, 925-26 (7th Cir. 2009), *cert. denied*, ___ S. Ct. ___, 78 U.S.L.W. 3294 (U.S. Nov. 16, 2009) (No. 09-7065).

Are contends that Jerome Murray, not he, was Rocco's boss. Are points out that, when a drug deal went bad, Rocco called Murray, not Are. According to Are, he was a mere middle man with no managerial function in the enterprise. (Are does not contest the finding that the criminal activity involved five or more participants, only whether he played a supervisory or managerial role.) However, the record easily supports the district court's finding that Are was a manager or supervisor in the criminal activity that involved five or more participants.

First of all, as the Application Note to § 3B1.1 indicates, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt. n.4; *see United States v. Millet*, 510 F.3d 668, 679 n.1 (7th Cir. 2007). This logic extends to a manager or supervisor position as well. Are

advances nothing to suggest any reason why both he and Murray could not have been managers or supervisors, if not organizers or leaders, in the drug conspiracy, particularly as such a role relates to Rocco.

Furthermore, Are's lecturing of Rocco at the McDonald's is significant. Officer Kimble testified that he heard Are lecturing Rocco about how to avoid law enforcement. Though Are argues on appeal that Kimble only heard "bits and pieces" of the conversation, and that Are was only "boasting about past conduct," the district court quite reasonably understood Kimble's testimony as the government construes it—that Are was disciplining Rocco and the other unidentified individual for a failed transaction. The court found Kimble's testimony to be "dramatic and convincing," an aspect of credibility to which we should defer to the district court's assessment. The district judge reasonably inferred that a person who would lecture other participants in a drug conspiracy on how to conduct their business could only be someone in a managerial position. The court also reasoned that such a person supervised the others' activities by directing them on what to do and how to do it. Audacity may not be a proxy for a § 3B1.1 enhancement, but Are's lecturing of Rocco and the other male on "how they screwed up and how they better do things in the future to keep from getting caught" supports the district court's finding. In addition, there was evidence that Are directed Murray to call Rocco in relation to the January 26 deal, and that after the seizure, Murray and Rocco discussed the need to call Are, at which point Murray reassured Rocco there "ain't nothin' to, uh, panic about," which also supports

the district court's finding that Are was a manager or supervisor of the criminal activity involving five or more participants.

### 2. Jerome Murray

Jerome Murray contends that the district court committed two errors in applying Guideline enhancements. He complains that the court erred in applying a four-level enhancement for being a leader of the drug conspiracy under U.S.S.G. § 3B1.1(a). He next argues, in the alternative, that the district court erred in relying on evidence introduced at his codefendants' trial without giving him proper notice in violation of Fed. R. Crim. P. 32(i)(1)(C) and in failing to make sufficient factual findings to support the enhancement.

*Background*

FBI Special Agent Jeffrey A. Cooper's affidavit was submitted in support of the criminal complaint originally filed to initiate the charges in this case. The affidavit stated that the Four Corner Hustlers gang was located on Chicago's south and west sides and in some southern and western suburbs and was historically linked to large-scale drug distribution in the Chicago area. The affidavit said that Jerome Murray was recognized as the "Chief" of the Four Corner Hustlers on the south side. Cooper's affidavit also referred to information obtained from various sources including four "cooperating witnesses" (CW1, CW2, CW3, and CW4, each of whom was

cooperating to obtain some form of benefit), coconspirator and Hustler gang member Clarence Whalum, and the wiretap of Murray's cell phone. (Law enforcement obtained a wiretap on Murray's cell phone on December 13, 2004, which continued for sixty days.)

CW1, an active and high-ranking Hustler gang member and drug dealer until 1999, when he was taken into custody, stated that Murray was responsible for the distribution of between 50 and 100 kilograms of cocaine per week. CW1 said that he maintained contact with Murray even while Murray was incarcerated (prior to 2001). According to CW1, a Nigerian, referred to as "Dummy" (believed to be Are), supplied heroin to the Hustlers.

CW2, then a current Hustler, was attributed in the affidavit with identifying a photograph of Murray as an individual known to him as "Head" and supplying information about a close relationship he had with an "Individual A" who told CW2 about Murray's drug trafficking. CW2 said that he was present for certain drug trafficking activities. In the summer of 2003, CW2 observed Murray and Individual A with a duffel bag containing fifty kilograms of cocaine. CW2 reported that Individual A told him that Murray's girlfriend (now wife), Catherine Fauntleroy, regularly held drugs for Murray. CW2 also observed Murray selling heroin to Daniels on two occasions. CW2 indicated that Daniels controlled a drug trafficking operation in Chicago.

CW3, a former member of the Hustler rival Black Disciples gang and drug distributor on the south side of Chi-

cago, expressed familiarity with the Hustlers and with the fact that Murray is their leader. CW3 identified a picture of Murray as an individual known to him as "Head." CW4, a member of the Hustlers from 1979 until his arrest in 1996, indicated that Murray "called the shots" for the Hustlers, controlled the Hustlers' drug trafficking, and that Hustlers are either supplied drugs by Murray or pay a "tax" (a portion of their profits) to Murray. According to CW4, a Nigerian known as "Dommy" (again, believed to be Are) distributed heroin and was close with Murray.

Cooper's affidavit indicated that Hustler gang member Clarence Whalum also had said that Murray "called the shots" for the Hustlers. Whalum stated that after several Hustlers were arrested, Murray told the others to be careful, which Whalum understood to mean to be careful about how they were running their drug operations. Whalum identified Daniels, known to Whalum as "Sko," as a Hustler who sold crack.

The affidavit indicated that CW1 previously had provided reliable information to law enforcement and was cooperating with the hope of receiving a reduction in the sentence he was currently serving. CW2 was cooperating in exchange for payment. CW3 was cooperating in hopes of receiving consideration on his sentence in a pending narcotics case. Like CW1, CW4 was cooperating in hopes of receiving a reduction in the sentence he already was serving. The affidavit asserted that the information from the cooperating individuals was reliable because it was corroborated by other information

obtained in the investigation, including other cooperating witness information, surveillance, intercepted conversations, drug seizures and controlled purchases of drugs. (The district court denied a pretrial request by Murray to disclose the identities of the cooperating individuals.) The affidavit also listed information obtained from the wiretaps, including that Murray bought a kilogram of cocaine from Julius Statham (which was then seized), that Murray brokered a heroin deal between Are and Daniels, that Kenard McCollum supplied heroin and cocaine to Murray, that Murray fronted cocaine to Steve Jordan and Lamont Hooks, that Fauntleroy purchased drugs with Murray and advised him on the drug business (e.g., keep multiple suppliers, break large quantities to smaller ones, and recruit others to do the buying and selling for him), and that Murray fronted coke and heroin to Bertell McKenzie who then redistributed it.

In his plea agreement, Murray admitted to buying a wholesale quantity of heroin from Are and wholesale quantities of cocaine from Statham. Murray also admitted to obtaining from Ramon Ceballos wholesale quantities of cocaine and heroin, as well as quantities of marijuana. Murray admitted to redistributing the cocaine and heroin to wholesale customers, including Hooks and Daniels, and to brokering deals for wholesale quantities of heroin or cocaine between customers and suppliers. The government asserted in the plea agreement that Murray should receive a four-level enhancement under U.S.S.G. § 3B1.1(a) for being an organizer or a leader of a drug organization involving five or more people, whereas Murray contended that he was a manager or supervisor

and, therefore, should receive only a three-level enhancement under § 3B1.1(b).

The PSR discussed the Hustlers' drug operations, concluding that Murray was its leader. As support, the PSR relied on the information in the complaint and statements by Agent Cooper, including that Murray was commonly viewed as the Hustlers' "Chief," that all decisions went through Murray, that Murray was responsible for directing other gang members in various aspects of the drug activities, including where they could sell and from whom they could buy, and that close to 100 Hustlers worked for Murray in some capacity. The PSR also noted that Fauntleroy (by then Murray's wife) assisted Murray with the drug trafficking organization. At sentencing, Murray argued that he acted as a broker, not a leader or organizer.

The district court agreed with the PSR's assessment of Murray's role in the offense, explaining:

> I'm frankly inclined to agree with the calculation in the presentence investigation report. I think it's right. It's conservative. I think everything that goes into that calculation is supported.

> [F]rom all the testimony that I heard, the different tape recorded conversations, the information in the presentence investigation report, the statements of the other co-defendants in this case, it's clear to me that the defendant was a leader.

> And I take into account only in part the fact that he is known as a chief of the Four Corner Hustlers street gang, only to this extent: It's indirect, cir-

cumstantial evidence of what his role was in this case. But there's plenty of other evidence and information in the way of the testimony that was given during the trial and the statements of the other co-defendants and the structure of the transactions to indicate that he was, in fact, a leader in this particular drug conspiracy, insofar as you can differentiate this from the other activities of the Four Corner Hustlers street gang.

### a. Section 3B1.1 Enhancement for Aggravating Role

The Guidelines authorize a four-level enhancement in offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In determining whether the four-level enhancement applies, the court should consider the same factors that are relevant to determining whether a defendant is a manager or supervisor. *Id.* cmt. n.4; *Longstreet*, 567 F.3d at 925-26. (See *supra* for our discussion of Are's challenge to his aggravating role enhancement.)

An organizer or leader is more than just a distributor. *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994). An organizer or leader must "influence the criminal activity by coordinating its members." *United States v. Skoczen*, 405 F.3d 537, 550 (7th Cir. 2005) (quotation omitted). "In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling." U.S.S.G. § 3B1.1 cmt. n.4. In sum, "we emphasize both relative

responsibility and control over other participants, and recognize that middleman status is not necessarily inconsistent with being a manager or supervisor." *United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008).

In determining whether a defendant is an organizer or leader, the district court need not rely solely on admissible evidence. U.S.S.G. § 6A1.3(a). Instead, the court may consider any relevant information, as long as it "has sufficient indicia of reliability to support its probable accuracy." *Id.* This standard comports with due process. *United States v. Acosta*, 534 F.3d 574, 582 (7th Cir.), *cert. denied*, 129 S. Ct. 612 (2008). The court also may rely on hearsay. *United States v. Sanchez*, 507 F.3d 532, 538 (7th Cir. 2007) ("[A] sentencing court clearly errs by considering hearsay evidence only if the evidence was devoid of any indicia of reliability."). The government can establish the reliability of hearsay with corroborating evidence. *United States v. Martinez*, 289 F.3d 1023, 1029 (7th Cir. 2002).

On appeal, Murray argues that he was merely a middleman, not a leader or organizer, simply facilitating deals between Are and Daniels. (This argument doesn't square very well with Murray's position in his plea agreement that he was a manager or supervisor.) In addition, Murray attacks each source of evidence upon which the district court relied: trial testimony, statements by codefendants, recorded conversations, the PSR's findings, cooperating witnesses, Clarence Whalum, and Officer Cooper's affidavit. Murray also argues that he was not afforded an opportunity to rebut the cooperating wit-

nesses' information because he did not know their identities. Thus, we must decide whether the district court's finding that Murray was an organizer or leader of the drug conspiracy was based on sufficiently reliable evidence.

The following evidence was sufficiently reliable and supports that finding:

(1) Murray admitted in his plea agreement to buying wholesale quantities of cocaine and heroin and redistributing those drugs to wholesale customers, including Hooks and Daniels.

(2) CW1 stated that Murray was responsible for the distribution of between 50 and 100 kilograms of cocaine weekly. CW3 said that Murray was the leader of the Four Corner Hustlers street gang. CW4 said that Murray "called the shots" for the south side Hustlers and controlled their drug trafficking. This evidence of Murray's leadership role was corroborated by Whalum, who said that Murray "called the shots" for the Hustlers on the south side of Chicago, and by Agent Cooper's affidavit, based in part on his investigation, including the wiretaps, surveillance, controlled buys and seizures. As in *United States v. Hankton*, 432 F.3d 779 (7th Cir. 2005), it appears that Murray's involvement in the Hustlers gang was inextricable from his participation in the drug trafficking. *Id.* at 794 ("[A]ll of the evidence presented—as well as commonsense—suggest that, in fact, Hankton's gang activities were intimately, related to and intertwined with, his drug distribution activities.").

(3) A December 28, 2004, recorded telephone conversation between Murray and Daniels in which Murray told Daniels to tell the "shorties" and "guys" to be "cool . . . and careful." These comments match up with what Whalum said about Murray instructing his people to be "careful" after several Hustlers had been arrested. Murray contends that the government takes this remark out of context and that the conversation reveals that he did not know what Daniels was up to or where he was. Still, Murray's words were an order to Daniels, and Whalum's statement is corroborating.

(4) Agent Kimble observed Are giving instructions on evasion to Rocco and another individual at a McDonald's after the January 26, 2005 seizure of heroin from Daniels. Kimble testified that Murray was disinterested, walked away, and seemed to carry on other business. This gives the impression that Murray was not controlled by Are, yet the others there were, and that Murray held a position of authority in the organization that was at least on the same level as Are's.

(5) Murray was the "conduit of information" for all participants. He was party to most, if not all, of the 61 phone calls played at trial, and he used those calls to coordinate the distribution of heroin from Statham through Rocco and Are to Daniels. *See Millet*, 510 F.3d at 679 (finding district court did not clearly err in determining that defendant was a leader in the drug conspiracy where, inter alia, he was a conduit of information).

(6) CW2 related information he learned from another individual that Fauntleroy was storing narcotics for

> Murray on a regular basis. This was corroborated by Fauntleroy's plea agreement, in which she admitted to receiving and storing drugs, including heroin and multiple kilograms of cocaine, for Murray. At Murray's sentencing hearing, the AUSA argued that Murray supervised Fauntleroy, based on her plea admissions to having stored large amounts of cocaine for Murray.

In addition, Murray even admits in his appellate brief that "both Daniels and Murray had distributors that worked for them." This also supports a finding that Murray played a leadership role in the offense.

In challenging the evidence, Murray disparages the information provided by the CWs, arguing that it was unreliable because it was uncorroborated. While some of the CWs' information was not corroborated, for example, CW4's statement that Murray charges his people a "tax," many of the CWs' statements were corroborated by other reliable evidence. Murray next attacks the CWs' statements by arguing that they should have been excluded because the district court did not afford him an opportunity to rebut them. Murray claims he was not afforded that opportunity because the government did not disclose the CWs' identities. But he cites no case, and we are unaware of any, which requires a court to reveal a cooperating witness's identity before relying at sentencing on information provided by the witness. And we have observed that "confidential informants are not *categorically* unreliable." *United States v. Wilson*, 502 F.3d 718, 722 (7th Cir. 2007). In any event, the district court found the CWs sufficiently reliable, not because they corroborated each other, but because "Whalum, phone

taps, surveillance, and seizures" corroborated their information.

But even if the court erred in relying on the CWs' statements, such an error was harmless given the other substantial evidence establishing that Murray was an organizer or leader in the criminal drug conspiracy. *See United States v. Kincannon*, 567 F.3d 893, 899-900 (7th Cir. 2009) ("[N]ot all errors require remand since they are subject to harmless error analysis."). Murray also complains that Agent Cooper's assertions were based on the CWs' information and, as a result, were also uncorroborated and unreliable. He is incorrect. Other information, from Whalum, the wiretap evidence, and Agent Kimble's observations at the McDonald's, corroborated the agent's statements. The district court did not clearly err in applying the four-level enhancement under § 3B1.1(a).

### b.  Evidence from Codefendants' Trial

Murray contends, in the alternative, that his case should be remanded for a new sentencing hearing because the district court relied on evidence introduced at the trial of his codefendants as well as other codefendant statements without giving him proper notice. Murray claims that the PSR did not provide him with any notice that the court would consider evidence introduced at his codefendants' trial. As he concedes, because he did not object in the district court, we review for plain error. Thus, Murray must show "(1) an error has occurred, (2) it was 'plain,' (3) it affected a substantial right of the defendant, and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings."

*United States v. Nitch*, 477 F.3d 933, 935 (7th Cir. 2007) (quotation omitted).

Federal Rule of Criminal Procedure 32(i)(1)(C) requires a sentencing court to "allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence." This rule gives the defendant "a right to know what evidence will be used against him at the sentencing hearing." *United States v. Morales*, 994 F.2d 386, 389 (7th Cir. 1993). This includes evidence from a codefendant's trial, especially if the defendant was not a party in that case and could not challenge the reliability of the evidence. *Id.* If a sentencing judge is going to consider evidence from a codefendant's trial, then he should warn the defendant and give him a chance to review the trial transcript. *Id.*

In the plain error context, however, the defendant must show "a high degree of prejudice . . . as well as a high degree of certainty that it really was an error." *Id.* at 390. In *Morales*, we affirmed despite the district court's failure to notify the defendant of its reliance on other trial evidence. We noted that the defendant could not argue that the undisclosed information was "inaccurate or otherwise inappropriate for consideration in the sentencing hearing." *Id.* And the defendant's counsel acknowledged that she hadn't even read the transcript. *Id.* Accordingly, we found no plain error. *See also United States v. Anaya*, 32 F.3d 308, 314 (7th Cir. 1994) (finding no plain error because the defendant "did not demonstrate that the information derived from [a codefendant's] sentencing hearing was unreliable," failed to establish

the extent to which the court relied on it, and other information supported aggravating role enhancement).

The district court did not give Murray prior notice of its intent to use evidence from his codefendants' trial in determining whether to apply the leadership role enhancement. Under most cases in our circuit, this would be error. However, in *Acosta*, 534 F.3d at 582, we observed that any defendant is "on notice" about the potential use of evidence from a codefendant's trial, because "under the sentencing guidelines, he would be held responsible for the relevant conduct of his coconspirators if reasonably foreseeable to him." Murray argues that *Acosta* is an outlier upon which we should not rely and that it was not circulated under Rule 40(e), thus having little precedential authority in this circuit. We have not cited *Acosta* again for this proposition. Yet, we need not decide whether *Acosta* should be followed because, even assuming error, Murray has not shown that it was plain error.

Murray would have us take a strict view of what constitutes reversible error in the failure-to-give-notice context. He cites *United States v. Jackson*, 32 F.3d 1101, 1110 (7th Cir. 1994), in which a split panel concluded that the failure to notify the defendant that the court was intending to impose a certain sentencing guidelines enhancement was not harmless error. Applied to this case, Murray would have *Jackson* stand for the proposition that, if the court relied on the undisclosed evidence from Murray's codefendants' trial but would have reached a different result had he not relied on that evi-

dence, then we should reverse. *Jackson* is distinguishable, however, and *Morales* and *Anaya* are more on point. The sentencing court in *Jackson* failed to give the defendant notice that he would apply a particular Guideline enhancement, depriving him of any reasonable opportunity to challenge the enhancement both legally and factually. When the court relied on that enhancement in imposing the sentence, the defendant was clearly prejudiced and any error could not have been harmless.

Here, in contrast, Murray was aware of the leadership role enhancement; the PSR clearly identified it. Thus, the district court failed only to give Murray notice of one of the types of evidence that it would consider when determining whether the enhancement should apply. This deprived Murray of the opportunity to challenge that evidence's reliability and accuracy; it did not affect Murray's ability to challenge the Guideline's application. If Murray had a good faith argument that the evidence was unreliable, then the court's reliance on this evidence might be prejudicial. But on appeal, Murray does not question the reliability or accuracy of that evidence. He instead disagrees with the court's take on the undisclosed evidence, arguing that it merely showed that he was a middleman distributor, not an organizer or leader. The court's reliance on undisclosed evidence does not make the non-disclosure prejudicial. *See Anaya*, 32 F.3d at 314 (affirming in part because the defendant "did not demonstrate that the information derived from [codefendant's] sentencing hearing was unreliable"); *Morales*, 994 F.2d at 390 (affirming because the defendant

could not show that the evidence was "inaccurate or otherwise inappropriate for consideration in the sentencing hearing").

Given Murray's argument on appeal, non-disclosure in this case would only result in prejudice, or rather plain error, if we determined that the district court's view of the undisclosed evidence was incorrect. But as shown above, the trial evidence supports a finding that Murray was a leader of the drug conspiracy. Murray was a "conduit of information," as evidenced by the phone calls played at the trial. He arranged meetings between suppliers such as Daniels and distributors such as Rocco, and Murray coordinated the price and quantity for drug deals. At least one call showed him giving an order to Daniels—to tell the "shorties" to be "cool" and "careful." And Officer Kimble testified about Murray's conduct at the McDonald's while Are lectured other members of the conspiracy. Thus, the trial evidence, which Murray does not allege was unreliable, supports the district court's application of the enhancement. Any error in not disclosing the court's intent to rely on this evidence before sentencing was harmless and did not amount to plain error.

Murray also challenges the district court's reliance on "the statements of the other co-defendants in this case." It is unclear to which statements the court was referring. Nonetheless, the information in the PSR and the trial evidence, including the wiretap evidence, justify the decision to give Murray the § 3B1.1(a) enhancement.

### c. Sufficiency of the District Court's Findings

That brings us to Murray's challenge to the sufficiency of the district court's factual findings at sentencing, yet another challenge that he did not raise below, so again, our review is for plain error. The court's discussion of its findings is sparse. It did not evaluate the reliability of the evidence, nor identify extensive specifics to support its conclusion. Nor did the court identify those participants whom Murray controlled or recruited. However, where the district court adopts the PSR's findings, as it did here, the court rarely needs to add details. *United States v. Torres-Ramirez*, 213 F.3d 978, 980 (7th Cir. 2000). In *United States v. Patel*, 131 F.3d 1195, 1202 (7th Cir. 1997), cited by Murray, the court did not reference the PSR in concluding that the enhancement under § 3B1.1 was appropriate. But here, the district court did make that minimal effort.

Admittedly, the district court could have done a more thorough job in explaining its finding that Murray was an organizer or leader, but any error in making its factual findings was harmless. From the record it was obvious that Murray was at the center of the drug conspiracy with responsibility for organizing its activities, a fact that makes the cases cited by Murray, such as *United States v. Jewel*, 947 F.2d 224 (7th Cir. 1991), distinguishable. Murray supervised others, including Fauntleroy, and gave orders and directions to other Hustlers, for example, Daniels, with regard to their drug activities. Hence, a remand for further factual findings is unnecessary.

### 3. Statham

Statham brings three challenges to his sentence. He argues that the court erred in applying a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon during or in connection with a drug trafficking offense. He also challenges the court's criminal history calculation. And, third, Statham argues that the court failed to adequately consider the § 3553(a) factors in determining his sentence.

### a. Possession of Firearm in Connection with Drug Crime

The district court applied the § 2D1.1(b)(1) enhancement based on the two guns found in Statham's home in the safe that also contained about $21,000. Statham admitted in his plea agreement that he possessed both firearms. He argues that the court should not have applied the two-level enhancement because no drugs were found in the safe or anywhere in his home when agents arrested him and found the guns. He also points to the PSR, which states that there was "no direct evidence linking said weapons to Statham's drug activities, rather, the FBI strongly suspects that the guns were used in relation to the defendant's drug activities." We review the district court's finding of a relationship between the weapon and drug offense for clear error. *United States v. Perez*, 581 F.3d 539, 546 (7th Cir. 2009).

U.S.S.G. § 2D1.1(b)(1) provides: "If a dangerous weapon (including a firearm) was possessed, increase [the base

offense level] by 2 levels." Application Note 3 to § 2D1.1 states:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

Application of § 2D1.1 involves a shifting of burdens. *United States v. Idowu*, 520 F.3d 790, 793 (7th Cir. 2008). The government bears the burden of first proving by a preponderance of the evidence that the defendant possessed the weapon. *Id.* (citing *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005)). The defendant need not have actual possession of the weapon; constructive possession is sufficient. *Id.* If the government carries its burden, then the defendant must show that it was "clearly improbable" that the weapon was connected to the drug offense. *Id.*

We have noted that when a gun is found in "close proximity" to illegal drugs the gun is presumed "to have been used in connection with the drug trafficking offense." *United States v. Souffront*, 338 F.3d 809, 833 (7th Cir. 2003). However, close proximity to drugs is not a requirement for application of the § 2D1.1(b)(1) enhancement. We have upheld application of § 2D1.1 where the weapon was not found in the same place as illegal drugs. *See, e.g., United States v. Parra*, 402 F.3d 752, 767 (7th Cir. 2005)

(upholding the finding that it was not "clearly improbable" that gun was connected to drug offense where gun was found under the mattress in defendant's bedroom and defendant was selling drugs out of her house); *United States v. Grimm*, 170 F.3d 760, 767-68 (7th Cir. 1999) (concluding that § 2D1.1(b)(1) could apply where defendant had a gun in the trunk of his car but no drugs were present where he had used the car to deliver drugs six weeks earlier).

Statham directs us to a few cases to support his argument that the district court erred in applying the § 2D1.1(b)(1) enhancement. First, he cites *United States v. Franklin*, 484 F.3d 912 (7th Cir. 2007), in which the defendant had been arrested in his van upon returning from purchasing cocaine. We reversed because the evidence showed that the weapon was likely a pocket knife that the defendant used in his electrician business; the district court may have miscalculated the length of the blade by misunderstanding the difference between a "sheath" and a "case"; the police officers who stopped the defendant saw the knife but did not confiscate it; and the government did not seek the enhancement anyway. *Id.* at 915-16. Statham also cites *United States v. Salery*, 119 F. Supp. 2d 1268 (M.D. Ala. 2000), in which the district court did not apply the § 2D1.1 enhancement. In that case, officers found a handgun when they arrested the defendant in his car and found another handgun and over $50,000 cash in a subsequent search of the defendant's house. *Id.* at 1274-75. The district court observed that the arrest took place eight months after the most recent drug activity and no drugs were found on the

premises. *Id.* at 1275. It concluded that "evidence consisting of only a handgun and cash in a house does not support a finding of drug transactions in the home. . . . [T]he government has not produced any evidence to show that the defendant possessed the handguns during conduct relevant to the convicted offense." *Id.*

These cases are distinguishable from Statham's situation. On July 19, 2005, the two guns were found in a safe with a little over $20,000 in cash in the home of "a kilogram-size cocaine dealer." As the government notes, the amount of cash found in the safe is roughly the price of one kilogram of cocaine—the quantity that Statham had been providing to Murray. And the conspiracy was ongoing at the time the guns were found; it had not stopped eight months previously as in *Salery*. Statham even admitted in his plea agreement to having conspired to possess and distribute illegal drugs "continuing until July 19, 2005." Moreover, Statham doesn't claim that he had a legitimate source of income to account for the large amount of cash. The district court reasonably inferred that the cash was drug money. *See United States v. Smith*, 308 F.3d 726, 746 (7th Cir. 2002) (affirming because "[defendant's] testimony does not establish an innocent explanation for the presence of the guns found at his residence, where he kept more than $100,000 in cash, presumably derived, at least in part, from drug trafficking," even though officers did not find drugs at the residence). Statham offered nothing to rebut such an inference. And the court reasonably inferred that the guns were kept in the safe to protect the drug money. *See Perez*, 581 F.3d at 547 ("We have consis-

tently held that weapons are 'recognized tools of the drug trade' and that the possession of a gun can advance the possession and future distribution of narcotics by protecting the drugs or the drug dealer." (citation omitted)).

The temporal proximity to the conspiracy and the physical proximity to the cash suggest that the guns were connected to the Statham's drug dealing. Statham did not show that it was clearly improbable that the guns were connected to the drug conspiracy.

### b. Criminal History Category

Statham's next challenge is to the court's criminal history category calculation. First, he objects to the addition of two points on the basis of his commission of the instant offense within two years from release from custody pursuant to U.S.S.G. § 4A1.1(e).

During a recorded call on January 25, 2005, Murray called Statham and asked him whether the "stripper broad was 19," meaning whether the kilogram was still $19,000. Statham replied that "she was still around there and she still is the same," meaning that he still had kilograms of cocaine and they were still the same price, and Murray said that he might need "3 or 4 of them broads [kilograms] to come to the party." Statham told Murray to call him. Murray made several more calls to Statham on January 29, 30, and 31. Later on the 31st, surveillance units observed Statham meet with Murray, after which law enforcement conducted a traffic stop of Murray and recovered just under one kilogram of cocaine.

The PSR indicated that Statham was released from custody on parole on January 29, 2003, and on January 25, 2005, began negotiating the January 31, 2005, cocaine sale with Murray. (The PSR adopted the allegations of the criminal complaint. Statham has not challenged the negotiation dates provided in the criminal complaint and in the government's version of the offense which is attached to his PSR.) The government contends that the January 31 sale is the culmination of the January 25 negotiation.

Under U.S.S.G. § 4A1.1(e) two points are added to a defendant's criminal history "if the defendant committed the instant offense less than two years after release from imprisonment." Statham argues that the additional points should not have been applied because he was charged for this crime on January 31, 2005, two years and two days after he was released from custody on parole.

The district court did not err in applying the enhancement under § 4A1.1. Application Note 5 to § 4A1.1 states: "Two points are added if the defendant committed any part of the instant offense (i.e., any relevant conduct) less than two years following release from confinement on a sentence counted under § 4A1.1(a) or (b)." The January 25th call between Statham and Murray is a part of the conspiracy count to which Statham pled guilty. This phone call got the ball rolling for the January 31 drug transaction. Based on this call, Statham would have "committed the instant offense [of conspiracy]" at least as early as January 25, 2005, so § 4A1.1(e) applies. Likewise, the January 29 call was part of the negotiations that culminated in the January 31 transaction.

Furthermore, Statham admitted in his plea agreement that beginning no later than *January 2002*, he conspired with others to possess with intent to distribute and to distribute cocaine. Thus, he admitted to committing the conspiracy offense even before he was released from custody on parole. And, Statham also admitted in his plea agreement that he supplied cocaine to Murray in January 2005 and further admitted that before the January 31 kilogram transaction, he delivered at least three ounces of cocaine to Murray on at least three separate occasions. These admissions support the reasonable inference that Statham delivered cocaine to Murray prior to January 29, 2005, and that such delivery was part of the conspiracy. We find no error in adding two points because the record supports the district court's finding that Statham participated in the conspiracy less than two years after his release from custody on parole.

Next, Statham argues that the district court erred in treating three of his prior convictions as separate offenses when calculating his criminal history points. Statham made the identical argument in his appeal of another case, *see United States v. Statham*, 581 F.3d 548, 554 (7th Cir. 2009), and it is no more persuasive here. On August 6, 1996, Statham was sentenced for the crimes of theft and the unlawful use of a firearm by a felon, for which he was arrested on December 17, 1995. Also on August 6, 1996, he was sentenced for possession of a controlled substance; he was arrested for that offense on February 24, 1996. And, on August 7, 1996, Statham was sentenced for a probation revocation, based on a 1989

arrest for burglary. Statham contends that the district court should have treated these convictions as functionally consolidated because the sentences were imposed on the "same" day and the state judge apparently intended "that a concurrent sentence was appropriate punishment for all three convictions." But that doesn't seem to have been the judge's intent. Instead, it appears that the judge intended for two of the sentences to run concurrently and for the sentence for possession of a controlled substance to run consecutively. *See id.* at 554-55.

U.S.S.G. § 4A1.2(a)(2) instructs the district court that in computing criminal history points:

> If the defendant has multiple prior sentences, determine whether those sentences are counted separately or as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Count any prior sentence covered by (A) or (B) as a single sentence. See also § 4A1.1(f).

The Guidelines were amended effective November 1, 2007, between the time Statham committed the offense and the time he was sentenced. We apply the version in

effect at the time of sentencing. U.S.S.G. § 1B1.11(a)-(b); 18 U.S.C. § 3553(a)(4)(A)(ii). Both the government and Statham rely on "functional consolidation" cases that interpret the former Guidelines version. Now, though, the Guideline is more straightforward: Prior sentences always are counted separately if they were for offenses separated by an intervening arrest. *See Statham*, 581 F.3d at 555 (finding that notwithstanding the Guideline amendment, the logic of *United States v. Best*, 250 F.3d 1084, 1094 (7th Cir. 2001)—"intervening arrests preclude consolidation of cases"—"remains compelling"). The record shows that each of the three offenses at issue was separated by an intervening arrest. Thus, the district court did not err in treating these three convictions as separate offenses when calculating Statham's criminal history category.

### c. Consideration of § 3553(a) Factors

And, finally, Statham argues that the district court erred in failing to adequately consider the § 3553(a) factors. He argues that instead of applying § 3553(a)(2), the court merely told him that his conduct was detrimental to society. Beyond this, he simply states that the court failed to explain the various factors.

We review the district court's sentencing procedures, including its consideration of the § 3553(a) factors, de novo. *United States v. Corson*, 579 F.3d 804, 813 (7th Cir. 2009). If we find no procedural error, we consider the substantive reasonableness of the sentence under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007);

*United States v. Scott*, 555 F.3d 605, 608 (7th Cir.), *cert. denied*, 130 S. Ct. 341 (2009).

The sentencing transcript proves Statham's claims of error lack merit. After considering the record, including the sentencing memorandum, Statham's supplement to his attorney's memorandum, Statham's statements at the sentencing hearing, and those of the witnesses who testified at the hearing on his behalf, the court sentenced Statham to 125 months' imprisonment. This was in the middle of the Guideline range of 110 to 137 months. The court articulated the basis for the sentence imposed, discussing the need for punishment, deterrence and rehabilitation. In particular, the court noted that Statham's prior sentences—probation, parole, light sentences and the like—had not deterred him or caused him to change his criminal ways and stated that Statham was not likely to be rehabilitated. The court also mentioned the need to protect the public from the types of conduct that Statham had been involved in over an extended period of time, referring to his fourteen-year span of criminal history. And the court discussed the seriousness of the offense, and the destructiveness of drug trafficking in the neighborhoods and the attendant violence. The district court's statement of reasons for Statham's sentence was sufficient "to allow for meaningful appellate review and promote the perception of fair sentencing." *Scott*, 555 F.3d at 608 (quotation omitted). In our view, the court did not fail to adequately consider the § 3553(a) factors or fail to adequately explain the chosen sentence.

Finding the court's sentencing procedures sound, we turn to the substantive reasonableness of Statham's sentence. A sentence properly calculated within the Guidelines range is presumed reasonable on appeal. *Rita v. United States*, 551 U.S. 338, 347 (2007); *United States v. Meece*, 580 F.3d 616, 621 (7th Cir. 2009). A defendant can rebut this presumption of reasonableness by showing that his sentence is unreasonable when considered against the § 3553(a) factors. *United States v. Campos*, 541 F.3d 735, 750-51 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 955 (2009). Statham has not done so.

### III.  Conclusion

For the foregoing reasons, we affirm.