In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3098

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RON COLLINS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cr-00673-1—**Virginia M. Kendall,** *Judge.*

ARGUED APRIL 1, 2013—DECIDED MAY 15, 2013

Before BAUER, KANNE, and TINDER, *Circuit Judges.*

BAUER, *Circuit Judge.* Ron "Ron Ron" Collins partic-
ipated in a drug-distribution conspiracy stretching from
Mexico to Milwaukee that involved mass amounts of
cocaine. For his role, Collins was found guilty of con-
spiracy to possess with intent to distribute and
to distribute five kilograms or more of cocaine, in viola-
tion of 21 U.S.C. § 846, and sentenced to a prison term
of 360 months. Collins challenges both his conviction

and the sentence imposed. He contends, first, that the district court improperly admitted into evidence certain tape recordings at trial, and second, that the district court erred in allowing an expert to testify regarding "coded drug-dealing language" on the tapes. He also argues that the district court erred in applying the "manager or supervisor" enhancement pursuant to U.S.S.G. § 3B1.1. Finding all of Collins' contentions unpersuasive, we affirm.

## I. BACKGROUND

From at least 2005 to November 2008, Collins acted as a linchpin in a large drug-distribution conspiracy based in Mexico. Collins had two connections in Mexico—the Flores twins, Pedro and Margarito—who were his sources for his drug of choice, cocaine. Whenever Collins needed cocaine to deal, he contacted the Flores twins, who contacted their drug couriers, who in turn would deliver the necessary drugs to Collins in the Chicagoland area. A given delivery to Collins sometimes included 20 to 50 kilograms of cocaine, and the Flores twins often "fronted" the drugs or had them delivered to Collins on "credit."

Upon receipt of the cocaine, Collins would sell it to the members of his "crew." Collins made a profit of approximately $1,500 per kilogram sold; that is how he made the money needed to pay back the Flores twins. The members of Collins' crew sold the cocaine to other lower-level buyers on the streets. This cycle repeated as fast as the cocaine could be sold.

One crew member to whom Collins repeatedly sold cocaine was Robert Gregory, a Milwaukee, Wisconsin native. Collins first met Gregory in early 2006 at Lee's Auto Shop in Chicago, Illinois. It was then that Collins asked Gregory about selling cocaine and whether he would purchase cocaine from Collins to sell to other buyers in Milwaukee; Gregory agreed to do so because Collins offered "a good price." This solidified their relationship, and for the next three years, Collins provided Gregory with cocaine to sell in Milwaukee. However, all of their transactions occurred in the Chicagoland area and at Collins' direction. By the end of the conspiracy, Collins was providing Gregory with four kilograms of cocaine approximately every two to three weeks.

In the fall of 2008, Pedro and Margarito Flores agreed to cooperate with the Drug Enforcement Administration's (DEA's) investigation of drug trafficking between Mexico and the United States. DEA Special Agent Eric Durante was the lead case agent in the relevant investigation. That put him in contact with Pedro, to whom he periodically spoke with on the phone from August to November 2008.

On November 6, 2008, Agent Durante had a meeting with Pedro in Mexico. At that time Agent Durante instructed Pedro to record his telephone conversations with "drug suppliers and drug customers" when it was safe to do so. Shortly thereafter, Pedro provided the government with numerous tape recordings, some of which included conversations between him and Collins (as we discuss in more detail below).

On August 6, 2009, Collins was indicted on one count of conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine and one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The reference to heroin was stricken on May 26, 2011, and the case proceeded to trial.

At trial, the government moved to admit three of Pedro Flores' November 2008 taped conversations with Collins. The district court granted the government's request over Collins' objection that the tapes lacked an adequate foundation. With the tapes admitted into evidence, the government called Officer Robert Coleman to testify regarding the "coded drug-dealing language" on the tapes. Collins did not object to the testimony's admissibility at the time but now contends the testimony was improper.

The jury returned a verdict of guilty, and on September 7, 2011, the district judge sentenced Collins to 360 months' imprisonment, followed by five years of supervised release. This sentence was at the lower end of the U.S. Sentencing Guidelines, which called for a term of 360 months to life. The Guidelines range the judge applied included an enhancement under U.S.S.G. § 3B1.1 because the judge determined that Collins' conduct in the conspiracy qualified him as a "manage or supervisor." Collins objected to the enhancement.

## II. DISCUSSION

Collins' appeal focuses on three errors he believes the district court made: (1) admitting into evidence the

November 2008 taped conversations between him and Pedro Flores; (2) allowing the government expert to testify regarding the "coded drug-dealing language" on the tapes; and (3) determining he was a "manager or supervisor" pursuant to U.S.S.G. § 3B1.1 and increasing the applicable Sentencing Guidelines range. We address each argument in turn.

## A. Tape Recordings

The district court admitted into evidence three tape recordings of calls that were purportedly between Pedro Flores and Collins. (Collins contended he was not on the recording.)[1] One recording was made on November 25, 2008, at 12:23 p.m.; the second on November 29, 2008, at 1:59 p.m.; and the third on November 30, 2008, at 12:13 p.m. On each of the recordings, Pedro discussed various information regarding the cocaine-distribution scheme with the "speaker," including prices, quantities, quality of drugs, and the use of other people to distribute the goods. Each recording was made outside the presence of government agents.

Collins contends the tape recordings were improperly admitted because the government failed to lay a

---

[1] All three of the tapes were played at trial, and the jury was provided with a transcript of each call. A recording of Collins' voice from the McHenry County jail was also obtained and played at trial, so the jury could make its own voice comparison.

proper foundation under Federal Rule of Evidence 901. Rule 901(a) requires a party seeking to admit an item into evidence at trial to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." For tape recordings, this can be done in two ways: (1) a chain of custody demonstrating the tapes are in the same condition as when they were recorded, or (2) testimony demonstrating the accuracy and trustworthiness of the tapes. *United States v. Thomas*, 294 F.3d 899, 904 (7th Cir. 2002); *see United States v. Eberhart*, 467 F.3d 659, 667 (7th Cir. 2006). District courts are given wide latitude in determining whether the burden has been met, so we review this determination for an abuse of discretion. *Id.*

In this case, the government satisfied its burden under both methods of proof. Beginning with the chain of custody: Agent Durante, who was stationed in Chicago, and Agent Jake Galvan, who was stationed in Guadalajara, Mexico, testified at length regarding the tapes' history and how Agent Galvan shipped the tapes to Agent Durante once he received them and the tape recorder from Pedro. They described their communications with Pedro in November and December 2008 and their instructions to him regarding when and how to record his conversations with "drug suppliers and drug customers" and to deliver the tapes to the government. They testified that upon receiving the tapes, they labeled them, copied them, and downloaded their contents. They also testified that the tapes never left the government's possession after the moment of receipt. *See Thomas*, 294 F.3d at 905

("[I]f the tapes were in official custody at all times, a presumption arises that the tapes were handled properly.").

Collins argues this evidence was insufficient to establish a proper chain of custody because the agents' testimony "[did] nothing to answer the lingering questions of the whereabouts of the [recording] device while it was in Mexico." It is this argument, however, that lacks an adequate foundation. We acknowledge that Flores did not testify at trial and that no government agents were present when Flores made the recordings, but merely raising the possibility of tampering is not sufficient to render evidence inadmissible. *Id.*; *see United States v. Wilson*, 973 F.2d 577, 580 (7th Cir. 1992) (explaining that a defendant's contention that certain tape recordings were not authentic because they did not remain "in the sole custody of the government" was meritless). The government is only required to demonstrate that it took "reasonable precautions" in preserving the evidence; it is not required to "exclude all possibilities of tampering." *United States v. Moore*, 425 F.3d 1061, 1071-72 (7th Cir. 2005). We think the government's procedures in obtaining the tape recordings and preserving their accuracy were reasonable in light of the circumstances surrounding this case—it would be an impossible standard to always require agents to be present when a tape recording is made, especially in foreign countries. *See United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977) ("There is no requirement that the tapes be put in evidence through the person wearing the recorder, or for that matter, through a contemporaneous witness to the recorded conversations.").

Any possible, however hypothetical, gap in the chain of custody goes to the weight of the evidence, not its admissibility. *See, e.g.*, *United States v. Tatum*, 548 F.3d 584, 587-88 (7th Cir. 2008) ("The government does not need to prove a 'perfect' chain of custody, and any gaps in the chain 'go to the weight of the evidence and not its admissibility.'" (quoting *United States v. Scott*, 19 F.3d 1238, 1245 (7th Cir. 1994)).

Moreover, the government provided ample circumstantial evidence supporting the tapes' accuracy and trustworthiness. One example is voice identification. Federal Rule of Evidence 901(b)(5) permits a witness to identify a person's voice on a recording "based on hearing the voice at any time under circumstances that connect it with the alleged speaker." This is not a very high bar. *See United States v. Mendiola*, 707 F.3d 735, 740 (7th Cir. 2013) (collecting cases). Agent Durante testified that he became familiar with Collins' voice during a forty-five minute interview with Collins, and because of that, he was able to identify Collins as one of the speakers on the November 2008 recordings. Likewise, Agent Patrick Bagley testified that he became familiar with Collins' voice after listening to over twenty recordings of Collins speaking at the McHenry County jail and was able to use that familiarity to authenticate Collins' voice on the tapes. Both agents confirmed that the person on the tapes was in fact who the government said it was: Collins.

The government proffered additional information showing that a timestamp on each of the November 2008

recordings coincided with three calls included in the cell phone records of Pedro's phone, which were admitted as evidence at trial. The date, time of day, and duration of each of the three calls matched those of the three recordings. And the three calls were made between Flores and a "773" Chicago area code number that was programmed in Pedro's phone under the name "Ron Ron." Cell phone records obtained later from that "773" number revealed that the three calls matching the dates, times of day, and durations of the three recordings were all with the same Mexico-based phone number. The calls were also made in conformance with the timeframe Flores and the speaker discussed on the recordings. For instance, on the first recording, Pedro told the speaker to give him until Friday or Saturday; the speaker called him back on Saturday, November 29, on the same day and at the same time as the second recording. On the second recording, Pedro told the speaker he would call him right back. That did not occur, and on the third recording—the next day, Sunday, November 30—Pedro acknowledged forgetting to call the speaker back the previous day, to which the speaker responded, "I'm waiting on y'all." We are satisfied that this information also provided the district court with adequate justification to admit the tape recordings.

## B. Expert Testimony

Having determined that the tape recordings were properly admitted, we look to whether the district

court appropriately allowed the government's expert to testify regarding the "coded language" on the tapes. We review a district court's decision to admit expert testimony for an abuse of discretion. *United States v. Pansier*, 576 F.3d 726, 737-38 (7th Cir. 2009)*.* When a party does not object at trial, however—as is the case here—we review the admission for plain error. *United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012).

Officer Coleman provided testimony at trial that interpreted the "code words" and language Collins used on the tape recordings. The purpose of this testimony was to link the words used with their generally-accepted meaning in the drug-dealing community, as the community's cryptic vernacular is likely outside the knowledge of the average juror. *See United States v. Avila*, 557 F.3d 809, 820 (7th Cir. 2009) ("Because the clandestine nature of narcotics trafficking is likely to be outside the knowledge of the average layman, law enforcement officers may testify as experts in order to assist the jury in understanding these transactions." (quoting *United States v. Noble*, 69 F.3d 172, 183 (7th Cir. 1995))). We need not provide an exhaustive synopsis of Officer Coleman's testimony, as a few examples are more than sufficient to understand the gist of the testimony we are reviewing:

> Question:  From your reading of the transcript and based on your training and experience, do you know what the reference to, Give me 30 up front, means?
>
> Answer:  Yes.

Question:  What does it mean?

Answer:    30 kilos on credit.

. . . .

Question:  From your reading of the transcript and based on your training and experience, what does the phrase, He had to break them down, refer to?

Answer:    It's in reference to taking the kilogram in its pure form and breaking it down and stepping on it and mixing it with a dilutant or a cutting agent and in order to expand its value and make more money.

. . . .

Question:  And based on your training and experience, does paper have another meaning in that sentence?

Answer:    Yes.

Question:  And what is that meaning?

Answer:    Paper is a common code word for money.

Federal Rule of Evidence 704(b) provides that "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Collins contends that Officer Coleman's testimony went directly to his "intent and knowledge" and, thus, deprived him of a fair trial. But cutting to the core of Collins' argument,

we do not see how Officer Coleman's testimony is any different from the expert testimony we upheld in many cases like this one. *See, e.g.*, *United States v. Are*, 590 F.3d 499, 512-14 (7th Cir. 2009) (upholding the admission of "coded language" testimony because the expert officer "testified based on his experience and training in wiretap and drug trafficking investigations . . . that he was familiar with the language and words that 'drug dealers' use . . . [,] that he had not interviewed any witness in relation to the case on trial," and that he "had no knowledge of the facts of the case or the allegations against the defendants."). As in *Are*, Officer Coleman was testifying based on his knowledge of "common practices in the drug trade" and not on "some special familiarity with the workings of [Collins'] mind." *See United States v. Lipscomb*, 14 F.3d 1236, 1241-42 (7th Cir. 1994); *see also Are*, 590 F.3d at 512-13 (comparing Officer Coleman's testimony to the expert testimony in *Lipscomb*). In fact, the expert officer in *Are* is the same expert Collins challenges in this case. The testimony was, therefore, properly admitted.

We briefly note that at the beginning of Officer Coleman's testimony, he stated, "29, 5 is in reference to what *Mr. Collins* wants to sell the kilos for." The use of "Mr. Collins" in that sentence was inappropriate because the remark went beyond Officer Coleman's general knowledge of coded drug-dealing terminology. *Cf. United States v. Glover*, 479 F.3d 511, 516-17 (7th Cir. 2007) (upholding the admission of the expert officer's drug-dealer testimony because he made no references to the defendant's "intent"). But Collins' counsel's ob-

jection to the use of "Mr. Collins" was sustained, and thereafter, Officer Coleman referred to the man on the recordings as "the speaker." Collins' counsel also cross-examined Officer Coleman and asked him if he could tell whether the voice on the tapes was Collins; Officer Coleman said, "I cannot." We believe these clarifications, coupled with Officer Coleman's assertion that he was testifying "based on his training and experience" and not on his familiarity with the facts of this particular case, sufficiently apprised the jury of the scope of Officer Coleman's testimony.

## C.  Sentencing Enhancement

Our last inquiry is whether the district court properly enhanced Collins' Guidelines range pursuant to U.S.S.G. § 3B1.1, which calls for a three-level increase in the offense level if the defendant was a "manager or supervisor" and the criminal activity involved five or more participants or was otherwise extensive.[2] Collins objects to the enhancement on the ground that Collins did not manage or supervise anyone. Citing *United States v.*

---

[2] Collins does not specifically challenge the second prong of § 3B1.1, that the criminal activity involved five or more participants or was otherwise extensive, but we believe the overall scheme in question easily satisfies the "otherwise extensive" requirement. *See United States v. Fluker*, 698 F.3d 988, 1002 (7th Cir. 2012) (describing what we consider in determining whether criminal activity is "otherwise extensive"). No further discussion is necessary.

*Mankiewicz*, 122 F.3d 399, 405-06 (7th Cir. 1995), Collins contends that he and Gregory only had a buyer-seller relationship, and this is insufficient to invoke the § 3B1.1 enhancement. We review the district court's application of the Sentencing Guidelines *de novo* and its factual findings for clear error. *Fluker*, 698 F.3d at 1001.

We have stated that "[a] supervisor, a manager, tells people what to do and determines whether they've done it." *United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012). Collins' role easily satisfies this description. Initially, it was Collins who reached out to Gregory at Lee's Auto Shop to bring him into the cocaine-distribution scheme. Then, for three years, Collins fronted Gregory *kilos* of cocaine, directed Gregory where and when to pick up the drugs and cash, and told Gregory how much to sell the product for. We have found this type of role to be sufficient in various criminal schemes for the "manager or supervisor" enhancement to apply. *See, e.g., United States v. Skoczen*, 405 F.3d 537, 550 (7th Cir. 2005) (explaining that control can include organizing another participant's role and continued involvement in the scheme). And more: Collins verified Gregory's drug-dealing procedures and directed Gregory to remove the tinted windows on his car so as to make sure Collins' drugs did not find their way into the hands of law enforcement personnel who might find the tint suspicious. And more importantly, Collins controlled the method by which he and Gregory communicated, providing Gregory with new cell phones every few months and deciding the proper time to switch phones.

Collins compares his interactions with Gregory to that of a simple buyer-seller relationship, but we are hardly moved by this characterization. In fact, it is telling that Collins frames the argument around the statement, "Decisions where to meet and how to talk aside . . . ." The particulars of how, when, where, and why they communicated are highly relevant to our inquiry. *See United States v. Doe*, 613 F.3d 681, 688 (7th Cir. 2010) (concluding that "more involvement than simply supplying or negotiating" drugs—including exercising decision-making authority, coordinating meetings between participants, and orchestrating the logistics of the drugs' transportation—is sufficient to warrant a "manager or supervisor" enhancement).

Collins says he was unaware of the specific people Gregory sold to but directs us to no authority that says he was required to know the specific end-buyers or where his drugs would ultimately come to rest for the § 3B1.1 enhancement to apply. Rather, what we do know is Collins was actively involved in what Gregory was doing (i.e., selling the cocaine he received from Collins), how he was doing it, where he was doing it, and when he was doing it. As Collins stated on the first recording, "Man, I got a crew, that ain't no problem." We are convinced Collins' conduct demonstrates Gregory was a part of his "crew," a minion in the overall conspiracy, and exemplifies the exact type of managerial or supervisory role contemplated in § 3B1.1. *Compare Figueroa*, 682 F.3d at 696-98, *and United States v. Grigsby*, 692 F.3d 778, 790-91 (7th Cir. 2012) (affirming the district court's conclusion that the defendant was

a "manager or supervisor" because the defendant planned the scheme, recruited participants, and directed execution of the illegal conduct), *with Mankiewicz*¸ 122 F.3d at 405-06 (reversing the district court's conclusion that a defendant was a "leader or organizer" because the only tasks the defendant asked his father to complete, which did not include selling or delivering any marijuana, did not have a "real and direct influence" on the distribution scheme).

Collins was Gregory's "manager" or "supervisor," through whatever lens is used to view their relationship, and the district judge properly enhanced the applicable Guidelines range under § 3B1.1.

### III. CONCLUSION

We AFFIRM Collins' conviction and sentence.