# United States Court of Appeals

### For the Eighth Circuit

_____

No. 24-3265

_____

United States of America

*Plaintiff - Appellee*

v.

Bailey Belt

*Defendant - Appellant*

_____

No. 24-3296

_____

United States of America

*Plaintiff - Appellee*

v.

Theodora Belt, also known as Theo Belt

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota

_____

Submitted: October 22, 2025
Filed: May 15, 2026

_____

Before SMITH, KELLY, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Following a joint jury trial, Bailey Belt and his mother, Theodora Belt, were convicted under the Major Crimes Act, 18 U.S.C. § 1153, of assaulting and murdering Elijah Morrison within the Cheyenne River Sioux Indian Reservation. At sentencing, the district court[1] found Elijah was a "vulnerable victim" under the applicable sentencing guideline and adjusted Bailey's and Theodora's sentences upward. U.S. Sentencing Guidelines Manual § 3A1.1(b)(1) (U.S. Sentencing Comm'n 2023) [hereinafter U.S.S.G.]. They now appeal the admission of certain surveillance footage, and Bailey appeals the application of the vulnerable victim adjustment. We affirm.

## I. Background

On May 26, 2023, Elijah and his siblings — Conan and Sara Morrison — were drinking alcohol with Bailey, Theodora, and two others at Conan's home in Bridger, South Dakota. Around one o'clock in the morning on May 27, an argument broke out. The Morrisons' aunt and minor nephew — Sybil Lone Eagle and M.H.H. — lived two houses away, and Lone Eagle had a surveillance camera facing Conan's property. That camera started capturing sporadic yelling just after one o'clock. Within an hour, the argument escalated into a brawl after someone set fire to a car behind Conan's home. When Conan tried to extinguish the fire, Bailey hit him on the head with a shovel, and Conan ran away to seek medical aid. Lone Eagle's camera then recorded an assault taking place in Conan's front yard next to a dark-colored sedan in the driveway: A male voice repeatedly shouted, "Stop," as

_____

[1]The Honorable Roberto A. Lange, Chief Judge, United States District Court for the District of South Dakota.

someone on the ground was beaten and struck with an object. Simultaneously, another voice shouted, "Get him. . . . Get him. Run him over. Let's go."

As the assault unfolded, M.H.H. awoke to the shouting. He observed the fire through his window and walked outside to see Theodora and Bailey kicking Elijah as he lay on the ground.[2] M.H.H. also witnessed Theodora striking Elijah with a shovel before seeing her and Bailey get into a car and run Elijah over. About thirty minutes later, the camera captured the arrival of Cheyenne River police officer Joseph Brings Plenty, Jr. When Brings Plenty arrived, he saw the fire and encountered Elijah, who was bloodied and unable to walk or speak coherently. Elijah died shortly after. Brings Plenty then located Sara at the front of the driveway, but she had almost no memory of the events.

Later that morning, FBI Special Agent Alexa D'Acunto spoke to Lone Eagle about her camera and learned the footage was accessible through an application on Lone Eagle's phone. So D'Acunto almost immediately obtained Lone Eagle's consent to take the phone and download the footage, which consisted of video clips separated by gaps of varying length. These gaps ranged from twenty-four seconds to over twenty-two minutes. The footage did not show Elijah being run over. The last clip capturing Elijah's assault was followed by an almost five-minute gap, and the next clip resumed after the assault was over and the dark-colored sedan had left Conan's driveway.

During the investigation, Cheyenne River police obtained an arrest warrant for Bailey and Theodora. Upon serving the warrant, investigators found blood on Theodora's car (a dark-colored sedan), and they later found a smudge on the inside of the car's windshield above the steering wheel. According to a forensic

---

[2]"We recite the facts in the light most favorable to the jury's verdict." *United States v. Thompson*, 133 F.4th 779, 780 (8th Cir. 2025) (quoting *United States v. Galloway*, 917 F.3d 631, 632 (8th Cir. 2019)), *cert. denied*, No. 25-5460 (U.S. Oct. 6, 2025).

examination, the blood on the car's exterior belonged to Elijah, and the smudge contained a mixture of Bailey's and Elijah's DNA.

At trial, the government moved to admit into evidence a compilation of the surveillance footage clips with the length of each gap marked. But Bailey and Theodora objected because Lone Eagle, who was by then deceased, could not explain the gaps. The district court admitted the footage, and several witnesses testified to events seen in it. For example, Sara and Conan identified Theodora's and Elijah's voices in the footage. M.H.H. identified Theodora's dark-colored sedan as the one used to run over Elijah, though his full testimony was at times inconsistent with itself and with statements he made to investigators right after Elijah's killing. And Brings Plenty, Conan, and M.H.H. testified about the fire.

## II. Analysis

Bailey and Theodora first argue the district court improperly admitted the surveillance footage because the government failed to authenticate it. "We review a [d]istrict [c]ourt's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affected the [d]efendant's substantial rights or had more than a slight influence on the verdict." *United States v. De La Torre*, 907 F.3d 581, 591 (8th Cir. 2018) (quoting *United States v. Espinoza*, 684 F.3d 766, 778 (8th Cir. 2012)); *see also* Fed. R. Crim. P. 52(a).

To authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Sufficient evidence may include the testimony of a witness with knowledge, or 'the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *United States v. Lamm*, 5 F.4th 942, 946 (8th Cir. 2021) (quoting Fed. R. Evid. 901(b)(4)). "The party authenticating the exhibit need only prove a rational basis for that party's claim that the [evidence] is what it is asserted to be." *Id.* (quoting *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010)). Once a party clears

this "low bar," the jury must ultimately decide whether the evidence is authentic. *Id.* at 947 (quoting *United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019)).

In *United States v. McMillan*, we articulated seven non-exhaustive factors to guide courts "in determining whether a proper foundation has been laid to authenticate recordings." *United States v. Kimble*, 54 F.4th 538, 547 (8th Cir. 2022) (citing *United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974)). The *McMillan* factors include whether (1) the device could record, (2) the operator was competent, (3) the recording is authentic and correct, (4) the recording was not altered, (5) the recording was preserved, (6) any speakers have been identified, and (7) any conversation elicited was voluntary. *Id.* (citing *McMillan*, 508 F.2d at 104). We have stressed, however, the factors "are not to be applied rigidly" because they are "merely helpful guidelines." *Id.* (quoting *United States v. Haire*, 806 F.3d 991, 996 (8th Cir. 2015)). So a recording need not meet every factor "as long as the totality of the circumstances satisf[ies] a court that the recording is reliable." *Id.*

Bailey and Theodora contend the government did not establish the third, fourth, or fifth *McMillan* factors. At trial, they presented an alternative perpetrator defense, suggesting Sara ran over Elijah. And since Sara was Lone Eagle's niece, Bailey raises the possibility Lone Eagle deleted critical pieces of footage to protect Sara. Considering the totality of the circumstances, however, we are satisfied the government cleared the low bar required for authentication. *See Lamm*, 5 F.4th at 947.

Regarding the third *McMillan* factor, the government provided a rational basis for concluding the footage was authentic and correct: Its substance and contents aligned with other trial evidence about what happened on May 27. *See* Fed. R. Evid. 901(b)(4). First, the footage shows a dark-colored sedan in Conan's driveway. Theodora drove a dark-colored sedan; M.H.H. identified Theodora's car as the one that ran over Elijah; and that car had Elijah's blood on it. Second, Sara and Conan placed Theodora and Elijah at Conan's home on May 27 and identified their voices in the footage. Third, the footage shows a fire burning behind Conan's

home. Brings Plenty's, Conan's, and M.H.H.'s testimony about the car fire corroborates this event. Fourth, the footage reflects the shouting heard by M.H.H. Fifth, the footage shows Brings Plenty's arrival to the scene and corroborates his description of the still-burning fire behind Conan's home. Sixth, the time stamps on the footage reflect all these events occurred during the early morning hours of May 27 — within the time frame identified by Brings Plenty, Sara, Conan, and M.H.H.

Turning to the fourth and fifth *McMillan* factors, Theodora and Bailey raise the possibility of tampering, but the government "is not required to exclude all possibilities of tampering" before the district court may admit a recording. *United States v. Collins*, 715 F.3d 1032, 1036 (7th Cir. 2013) (cleaned up); *accord West v. United States*, 359 F.2d 50, 55 (8th Cir. 1966). D'Acunto acquired and preserved the footage on the day of Elijah's killing, and as the district court observed, it is improbable Lone Eagle deleted footage because the gaps also appear during seemingly random sections of footage where nothing is happening. Moreover, we have repeatedly rejected the argument that gaps render a recording inadmissible just because they could show alterations or modifications. *See, e.g.*, *United States v. Oslund*, 453 F.3d 1048, 1055–56 (8th Cir. 2006). Gaps in a recording "affect 'the weight of the evidence, not its admissibility.'" *Id.* at 1056 (quoting *United States v. Byrne*, 83 F.3d 984, 990 (8th Cir.1996)).

When the district court admitted the footage, it properly instructed the jury to decide whether the gaps impacted the footage's weight. *See id.* And it permitted defense counsel to tell the jury during closing arguments why it should not rely on the footage. *Cf. De La Torre*, 907 F.3d at 591–92 (considering whether defendant had opportunity to offer his own interpretation of events captured in ambiguous recordings). The government produced sufficient evidence to support a finding the footage accurately depicted the events captured outside Conan's home on May 27. So the district court did not abuse its discretion by permitting the jury to ultimately determine the footage's authenticity and weight. *See Lamm*, 5 F.4th at 947.

Next, Bailey argues the district court erred in applying the vulnerable victim adjustment under the Guidelines. We "review factual findings supporting an enhancement for clear error, and legal conclusions about the [G]uidelines de novo." *United States v. Smith*, 145 F.4th 862, 871 (8th Cir. 2025) (alteration incorporated) (quoting *United States v. Nilsen*, 18 F.4th 587, 589 (8th Cir. 2021)). Whether a victim qualifies as vulnerable is a factual determination. *See United States v. Beckman*, 787 F.3d 466, 495 (8th Cir. 2015).

The Guidelines provide for a two-level upward adjustment to a defendant's offense level "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim . . . ." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is someone "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* § 3A1.1 cmt. n.2 (emphasis omitted). Applying the adjustment "requires a fact-based explanation of why advanced age or some other characteristic made one or more victims 'unusually vulnerable' to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability." *Beckman*, 787 F.3d at 495 (quoting *United States v. Anderson*, 349 F.3d 568, 572 (8th Cir. 2003)).

The district court found that Bailey ran Elijah over when Elijah was in a vulnerable state of semiconsciousness or unconsciousness brought on by being kicked and struck with a shovel. This finding is not clearly erroneous: Elijah had severe head injuries; Brings Plenty testified about Elijah's inability to walk or speak coherently after the assault; and investigators found Bailey's and Elijah's DNA above the steering wheel in Theodora's car, suggesting Bailey drove the car with Elijah's blood on his hands. Even so, Bailey argues the adjustment should not apply because Elijah lacked a preexisting vulnerability and became vulnerable only during the commission of the alleged crime. He also makes a double counting argument, claiming the vulnerable victim adjustment must be supported by conduct distinct from the offense of conviction. Both arguments lack merit.

First, § 3A1.1's definition of vulnerability is not limited to victims who were already vulnerable before the offense conduct began. *See* U.S.S.G. § 3A1.1 cmt. n.2. Accordingly, we have upheld vulnerable victim adjustments applied when the victim became vulnerable during the offense or the events leading up to it. *See, e.g.*, *United States v. Johnson*, 860 F.3d 1133, 1146–47 (8th Cir. 2017) (affirming adjustment when defendant rendered victim vulnerable by cutting off her clothes to prevent her escape before sexually assaulting her); *United States v. Rivera*, 554 F. App'x 535, 536–37 (8th Cir. 2014) (citing *United States v. Amedeo*, 370 F.3d 1305, 1317 (11th Cir. 2004)) (affirming adjustment when defendant rendered minor victim vulnerable by giving her marijuana before sexually assaulting her).

Second, Bailey's double counting argument is inapposite. "Double counting occurs when 'one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.'" *United States v. Strong*, 826 F.3d 1109, 1116 (8th Cir. 2016) (quoting *United States v. Hipenbecker*, 115 F.3d 581, 583 (8th Cir. 1997)). This means a sentencing court cannot apply multiple enhancements or upward adjustments based on "precisely the same aspect of a defendant's conduct . . . ." *Id.* (quoting *United States v. Waldner*, 580 F.3d 699, 707 (8th Cir. 2009)). But the court may certainly predicate enhancements or upward adjustments on conduct "that occurred during the commission of the offense of conviction . . . ." U.S.S.G. § 1B1.3(a)(1). The upshot is the vulnerable victim adjustment does not apply "if the factor that makes the person a vulnerable victim is incorporated in the offense *guideline*." *Id.* § 3A1.1 cmt. n.2 (emphasis added). Bailey was sentenced under the Second Degree Murder guideline, which does not address victim vulnerability. *See id.* § 2A1.2. So no double counting occurred here.

### III. Conclusion

We affirm the district court's judgment.

KELLY, Circuit Judge, dissenting.

I agree that McMillan is the touchstone for determining whether a proper foundation was laid to authenticate a video recording. But because the McMillan factors in this case do not support finding that the proffered recording is sufficiently reliable to establish its authentication, I respectfully dissent.

In McMillan, a law enforcement officer made recordings of conversations between the defendant and a confidential informant. In determining whether an adequate foundation had been laid for the recordings, we set out a non-exhaustive list of factors to consider:

> (1) That the recording device was capable of taking the conversation now offered in evidence.
> (2) That the operator of the device was competent to operate the device.
> (3) That the recording is authentic and correct.
> (4) That changes, additions or deletions have not been made in the recording.
> (5) That the recording has been preserved in a manner that is shown to the court.
> (6) That the speakers are identified.
> (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

McMillan, 508 F.2d at 104. In that case, we concluded the foundation was adequate, relying on the officer's testimony at trial "that he heard the voice of [the informant] at all times when he was making the recording, that that part of the conversation was accurate, and that immediately after the telephone calls were completed the tape was replayed by [him] in [the informant's] presence to verify that the conversations had in fact been recorded and that the instruments were operating correctly." McMillan, 508 F.2d at 104–105; see also United States v. Kimble, 54 F.4th 538, 546–47 (8th Cir. 2022) (officer operated the recording equipment and testified to his competency in doing so).

This case is different. It does not involve traditionally recorded evidence in the form of a video or audio file personally created by a law enforcement officer,

who was then able to testify at trial to lay the foundation for admission of the recording. Instead, this video evidence was automatically created by a home surveillance camera. No law enforcement officer participated in the creation of the recording, and no officer is depicted in it. The government did not even take possession of the recording device. Rather, Special Agent D'Acunto testified that Sybil Lone Eagle told her the video was saved to her phone on an app associated with her home surveillance camera. D'Acunto then downloaded the video clips onto a flash drive. D'Acunto did not know the name of the app, nor did she know the brand or model of Lone Eagle's surveillance camera. No evidence established whether the camera was motion activated or recorded continuously.

An automatically generated electronic recording is not self-authenticating. See Fed. R. Evid. 901; Fed R. Evid. 902. While Lone Eagle's home surveillance camera was capable of recording—insofar as it produced at least some video footage—there was no evidence presented from the person who installed it or from anyone with knowledge about how the camera operated. And because there was no evidence to explain *how* the device operated, there was similarly no evidence to support the conclusion that it was operating in the manner designed, or "competently." Indeed, the video at issue had significant gaps, ranging from 18 seconds to more than 20 minutes in length, and no witness could explain them. As the district court pointed out, we know "where the gaps are." But the record tells us nothing about *why* the gaps exist. Especially without knowing the type of camera Lone Eagle installed at her home, we cannot know whether the app associated with it allowed users to modify the recording, or even delete some or all of the video footage recorded—either intentionally or inadvertently.[3]

---

[3]Respectfully, neither United States v. Collins, 715 F.3d 1032 (7th Cir. 2013), nor West v. United States, 359 F.2d 50 (8th Cir. 1966), is helpful to our analysis. Collins, an out-of-circuit case, does not engage with the McMillan factors, as we must. Moreover, while Collins involved the admission of recordings generated and retained by a civilian who did not testify at trial, the record included greater indicia of reliability. The civilian who generated the recording was acting as a law enforcement informant, and had received "instructions . . . regarding when and how

We have said that the fact of gaps in a recording typically goes to the weight given to the evidence, not to its admissibility. In Ray, for example, the "gaps" at issue were short periods of time when "the conversation was unintelligible" and "by no means so substantial as to render the entire recording untrustworthy." United States v. Ray, 250 F.3d 596, 602 (8th Cir. 2001) (citing United States v. Webster, 84 F.3d 1056, 1064 (8th Cir. 1996)); see also United States v. Oslund, 453 F.3d 1048, 1055–56 (8th Cir. 2006) (concluding "gaps" that were "periods of the recordings when no voices or conversation can be heard, as when the recording occurred in a bar and ambient or background noise is all that is discernable at times," were "not enough to render the recordings inadmissible"). But here, the gaps are portions of the video that are missing entirely, without any evidence in the record to explain them. Gaps such as these are "substantial," going beyond the simple weight of the

---

to record his conversations . . . and to deliver the tapes to the government." Collins, 715 F.3d at 1035. And there, the government had not just the recordings, but also the specific tape-recording device the informant used to generate them. Id. The Collins recordings also had fewer indicia of tampering: the recordings had no gaps—explained or otherwise. See id. at 1034–37.

Our court's decision in West—which predates McMillan by several years—is similarly inapposite. As an initial matter, West concerned chain of custody of packets of marijuana and did not address electronic recordings at all. West, 359 F.2d at 55. More specifically, the issue in West was *law enforcement's* handling of those packets after an undercover officer purchased them from the defendant. Id. at 54, 55. "There [was] no evidence whatever that anyone either had the opportunity [or] the inclination to tamper with the packets or their contents." Id. at 55. Here, there is evidence of both opportunity and inclination to tamper with the evidence at issue. Law enforcement did not take custody of the video until hours after it was automatically recorded and made available to a civilian—who did not testify—on an unidentified, undescribed app on a phone. And though the district court dismissed the idea that Lone Eagle may have deleted some portion of the video because she was "nothing more than a neighbor," a review of the record shows Lone Eagle may have been more: she was related to every person present on the night in question—except the Belts. In this context, how the app worked and whether Lone Eagle had the ability to delete portions of the video saved to her phone become even more important.

evidence. See Webster, 84 F.3d at 1064 ("A partially inaudible recording will be inadmissible where the defendant establishes that the unintelligible portions are so substantial, in view of the purpose for which the tape is offered, as to render the recording as a whole untrustworthy." (citation modified)); cf. Ray, 250 F.3d at 602.

"We have repeatedly cautioned that the McMillan factors are not to be applied rigidly," and "a recording can be admitted 'even if not every factor is explicitly and completely met.'" Kimble, 54 F.4th at 547 (quoting Oslund, 453 F.3d at 1057). But the factors "become meaningful only when viewed in light of the facts of a specific case." Oslund, 453 F.3d at 1054 (quoting Durns v. United States, 562 F.2d 542, 547 (8th Cir. 1977)). Technology has changed—and continues to change—significantly since we decided McMillan in 1974. See id. at 1054–55 ("[T]he technology related to recording devices has greatly advanced since McMillan was decided, a fact that supports the premise that the McMillan factors are guidelines to be viewed in light of specific circumstances[.]"). As a result, how we view the meaning and weight of each factor, too, must change. In this specific case, the factors do not support finding that the video evidence is sufficiently reliable. See Kimble, 54 F.4th at 547 (looking to the totality of the circumstances to determine reliability). The district court rightly expected D'Acunto to address in her testimony many of the concerns the Belts raised about Lone Eagle's home surveillance camera and the resulting video footage, but the answers never came.[4]

---

[4]Few federal courts have addressed the admissibility of automatically recorded audio or video, but several state courts have—and, while those state court opinions generally apply state law, they are consistent in holding that, in a world of many technologies, the proponent of a video recording must supply some evidence about how the technology that produced the recording works. Reviewing a body of those state court decisions, the Vermont Supreme Court explained that "[c]ourts have admitted surveillance tapes and photographs made by surveillance equipment that operates automatically when a witness testifies to the type of equipment or camera used, its general reliability, the quality of the recorded product, the process by which it was focused, or the general reliability of the entire system." State v. Hiltl, 261 A.3d 1148, 1156, 1158 (Vt. 2021) (citations omitted) (collecting cases from Massachusetts, Maryland, and Alabama); see also State v. Samsinak, 688 S.W.3d

Admission of this evidence was not harmless. The video played a significant role in the government's case at trial, where the jury watched it, multiple witnesses discussed it, and the government relied on it repeatedly in its closing. I would reverse the Belts' convictions and remand for a new trial.

————————————————————

259, 266 (Mo. Ct. App. 2024) (approving a finding of authenticity where an officer testified that video was recovered from a specific brand of surveillance camera mounted near the front door of the defendant's house and a forensic expert testified regarding that specific brand's method of uploading and saving video clips); Boyd v. State, 267 N.E.3d 1050 (Ind. Ct. App. 2025) (unpublished table decision) (Home surveillance video was properly admitted after the homeowner and a detective collectively testified that "(1) [the surveillance footage] was a video captured by [the homeowner's] home security system on the night of the shooting; (2) [the homeowner] was the only person with access to the security system; (3) the system was working properly that night; (4) and the video had not been altered or changed. The security system automatically uploaded recordings, [the homeowner] accessed the recording from his cellphone, and [the detective] downloaded the recording and emailed it to the police department."); State v. Gray, 882 S.E.2d 469, 476 (S.C. Ct. App. 2022) (affirming admission of home surveillance video after a homeowner "testified that he owned and operated the security system that recorded the video[,] . . . the video [was] from the camera that faced [the relevant street, and] the time stamp on the video was incorrect because he did not set the correct date or time when he set up the security system"); Birdsong v. Barnett, 778 S.E.2d 372, 375 (Ga. Ct. App. 2015) (admitting home security video when the homeowner, who witnessed the recorded events, also testified about how she transferred the home security video to a disc that was then presented to the court).